Present:  All the Justices

LOWER CHESAPEAKE ASSOCIATES, A LIMITED
PARTNERSHIP T/A WILLOUGHBY HARBOUR
MARINA AND LITTLE BAY, LTD.

v.  Record No. 991787   OPINION BY JUSTICE BARBARA MILANO KEENAN
                                    June 9, 2000
VALLEY FORGE INSURANCE COMPANY


              FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
                          Jerome James, Judge


     In this appeal, we consider whether the trial court erred
in ruling that the owner of a marina was entitled to insurance
coverage under a commercial property insurance policy for damage
to the marina's docks allegedly caused by a hurricane.

     Lower Chesapeake Associates, a limited partnership trading
as Willoughby Harbour Marina, and its general partner, Little
Bay, Ltd. (collectively, Lower Chesapeake), operate a commercial
marina in Norfolk on Willoughby Bay (the marina).  The marina
consists of four, seven-foot wide floating docks, designated as
Docks A, B, C, and D, which provide about 300 boat slips for
pleasure craft.

     On September 6, 1996, Hurricane Fran struck the coast of
North Carolina and affected the Norfolk area with wind, rain,
and a storm surge.  About five months earlier, Lower Chesapeake
had obtained a commercial property insurance policy (the policy)
for the marina from Valley Forge Insurance Company (Valley

Forge).  Lower Chesapeake submitted a damage claim under the policy for "debris removal and repair and replacement of the damaged docks," based on damage allegedly caused by Hurricane Fran.  After Valley Forge denied coverage for the claim, Lower Chesapeake brought this breach of contract action seeking, among other things, an award of compensatory damages in the amount of $1.2 million.

At a bench trial, James Ripley, Jr., the marina's dock master, testified that all four docks were damaged during Hurricane Fran as a result of wind blowing against the boats moored at the marina.  Ripley stated that some of the lines securing the moored boats broke, and that the boats repeatedly collided with the short finger piers that project from the main docks.  He also explained that many of the boat lines were tied to cleats that were affixed to the deck boards.  The wind caused boats to draw against the lines and the cleats, causing the deck boards to "pull up."

Ripley testified that the waves during Hurricane Fran were insignificant and did not cause damage to the docks, but he agreed that the moored boats were "pitching" during the hurricane as a result of the wind and the waves.  He also acknowledged that he had told an insurance investigator soon after the hurricane that wind caused the wave action that damaged the docks.

Ripley explained that the floating docks were comprised of separate sections linked together by joints constructed of metal brackets and a type of flexible plastic or rubber. He stated that before Hurricane Fran struck, the marina had experienced problems involving broken joints, and that additional joints had broken during a "nor-easter" storm in March 1996 (the March storm), prior to the effective date of the policy.

Whenever a joint broke, marina personnel routinely repaired or "patched" it by replacing the flexible joint with a rigid connection between the dock sections. These rigid connections were made by nailing or bolting boards across the top of the deck or onto the stringers, the horizontal support beams under the deck, at the location of a broken joint. Similar repairs were made to the connections between the finger piers and the main docks. Many of these repairs "gave way" during Hurricane Fran.

The marina also had a floating wooden breakwater located between the docks and the entrance to the bay, which served to shelter the docks. Ripley explained that many sections of the breakwater had broken away during the March storm and had not been replaced before Hurricane Fran struck.

Lower Chesapeake had obtained an estimate of $194,000 to make the permanent repairs necessitated by the March storm, but had not made those repairs before Hurricane Fran struck. Ripley

described in detail the damage sustained by each section of each dock during Hurricane Fran, referring to numerous photographs that were admitted into evidence.  The damage to all four docks included loose and missing deck boards, displaced pilings, overturned utility pedestals, broken deck joints, and missing finger piers.  Ripley testified that Dock C "gave way" at its "dogleg" angle when wind pushed a moored boat against the dock. He acknowledged that the marina continued to use all of Docks A and B, and most of Docks C and D after the hurricane, without replacing any part of the docks.

Robert Layton, whose home is adjacent to the marina, testified that he went to the marina during Hurricane Fran to help secure the boats.  He saw cleats, planks, and utility pedestals pull from the dock decking, and observed finger piers break loose from the docks after some of the boats hit against the docks.  Layton stated that Hurricane Fran did not cause "significant" waves, and that "for a hurricane event, it was a relatively flat occurrence."

Michael Whitt testified that he rented a boat slip on Dock D of the marina from March 1995 until after Hurricane Fran struck.  He stated that he had complained to Ripley about the poor condition of the docks and the breakwater every week during the boating season.  Whenever the wind exceeded 20 to 30 miles

per hour, the cleats to which the boats were tied pulled from the deck boards because the deck wood was rotten.

Whitt testified that there had been numerous "Band-Aid fixes" made to the docks, such as boards being nailed or bolted over rotted dock joints and finger pier connections. He also explained that he frequently nailed boards across the decking near the cleats he was using in order to keep the cleats from "popping up," but that the deck wood was so rotten that these repair attempts were usually unsuccessful. Whitt stated that sections of the breakwater would "break loose during any type of storm that produced a good wind," and that some disconnected sections frequently floated loose in the water. He also testified that Dock C "broke in half" at its "dogleg" angle during Hurricane Fran.

James W. Smith qualified as an expert witness and rendered opinions on the damage to the docks and the estimation of repair and replacement costs. After Hurricane Fran, Smith inspected the marina's damage and estimated the cost of repairing all four docks. He concluded that 80% of Dock C and 88% of Dock D had sustained "considerable damage," and that the least expensive means of repairing these docks was to replace them completely. Smith also testified that about 40% of Dock B and 20% of Dock A were damaged and required replacement.

Smith's total assessment of the replacement cost for all four docks was about $1.3 million. He acknowledged, however, that he could not determine whether some of the damage he observed after Hurricane Fran had been caused by the earlier March storm. He also explained that he had not distinguished between storm damage and damage caused by rot or poor maintenance.

Jesse Herman Brown, Jr., also testified as an expert witness and rendered opinions on the damage to the docks and the estimation of repair and replacement costs. He examined the marina about a month after Hurricane Fran and concluded that the structural framework of Docks C and D had deteriorated to the point that these docks could not be repaired. Brown stated that this deterioration occurred over a period of years, and that the repairs made by marina personnel to the dock joints and finger pier connections were "[v]ery temporary, and dangerous."

Brown estimated a cost of about $991,000 to replace Docks C and D. He explained that he could not state the percentage of this cost attributable to the repair of damage caused by the hurricane, and that most of the damage he observed was caused by general deterioration and wear.

Richard Potts, a forensic civil engineer, qualified as an expert witness on the causes of structural failure and was the only expert to express an opinion about the cause of the storm

6

damage incurred during Hurricane Fran.  He examined the marina's docks about three weeks after the hurricane and also consulted a report on the hurricane issued by the National Oceanic and Atmospheric Administration (NOAA).  That report indicated that the NOAA station nearest the marina recorded sustained wind speeds of 42 miles per hour, a peak gust of 63 miles per hour, and a storm surge of two feet, six inches.

Potts explained that a storm surge is "the rise above normal elevation of the water due to the storm," and that this is a different phenomenon from waves or tides.  Although he had no data establishing the height of the waves at the marina during the hurricane, he concluded that there was a high probability that there was wave action of some degree.  Potts also explained that because large sections of the breakwater were missing, the breakwater could not dissipate as much of the wave energy as it was designed to do.

Potts testified that he found "excessive deterioration [and] decay," especially on Docks C and D, which had occurred over a period of between several months and a few years.  He stated that the pattern of damage he observed on the docks was not consistent with damage caused by wind alone.  In Potts' opinion, the primary cause of the damage was long-term deterioration, combined with the impact of waves and surging water.  He noted that the docks failed at the joints, and that

7

due to the existing deterioration, movement caused by even small waves would have been sufficient to inflict the damage.

Potts also testified that the repairs made by marina personnel to the docks' joints and finger pier connections prior to the hurricane were not effective.  He stated that the purpose of having flexible joints was to permit the floating dock sections to move with the water without experiencing undue stress.  The temporary repairs affixing rigid connections restricted the docks' flexibility and, thus, reduced their ability to withstand the stress caused by wave movement.

The Valley Forge policy issued to Lower Chesapeake, in addition to standard provisions for commercial liability and property insurance coverage, also contained "commercial inland marine coverage."  Included in the inland marine coverage provisions was a form entitled "Piers, Wharfs, and Docks Coverage Form" (dock coverage form).  The relevant portions of the dock coverage form provide:

**A.    COVERAGE**

We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.

    **1.    COVERED PROPERTY,** as used in this Coverage Form, means:

        a.    Floating or fixed piers, wharfs and docks;

        b.    Anchors and floats used with floating docks;

8

      c.    Covers, awnings, electrical wiring or plumbing which is permanently fixed to the pier, wharf or dock; or

      d.    Buoys or moorings.

              . . . .

**3.    COVERED CAUSES OF LOSS**

Covered Causes of Loss means RISK OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the exclusions.

**4.   a.   ADDITIONAL COVERAGE - COLLAPSE**

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

(1)  Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; breakage of glass; falling objects; weight of snow, ice or sleet; water damage; all only as covered in the Coverage Form;

(2)  Hidden decay;

(3)  Hidden insect or vermin damage;

      . . . .

We will not pay for loss or damage to the following types of property, if otherwise covered in this Coverage Form, under items (2), (3) . . . unless the loss or damage is a direct result of the collapse of a building:

9

outdoor radio or television antennas, including their lead-in wiring, mast or towers; awnings; gutters or down spouts; yard fixtures; outdoor swimming pools; fences; piers, wharves and docks; beach or diving platforms or appurtenances; retaining walls; walks; roadways and other paved surfaces.

. . . .

**b.   ADDITIONAL COVERAGE - DEBRIS REMOVAL**

We will pay for expenses you incur for the removal of debris of the Covered Property, which is occasioned by a "loss" covered by this Coverage Form.

. . . .

**B.   EXCLUSIONS**

1.   We will not pay for a "loss" caused directly or indirectly by any of the following.  Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss":

. . . .

**e.   WATER**

. . . .

(4)  Flood, surface water, waves, tides, tidal waves, overflowing of any body of water, or their spray, all whether driven by wind or not.

. . . .

3.   We will not pay for a "loss" caused by or resulting from any of the following.  But if

10

"loss" by a Covered Cause of Loss results, we will pay for the resulting "loss":

a. Weather conditions. But this exclusion only applies if weather conditions contribute in any way with a cause or event excluded in paragraph 1. above to produce the "loss";

. . . .

c. Collapse except as provided in the Additional Coverage - Collapse section of this Coverage Form.

d. Wear and tear, marring, denting or scratching; . . . gradual deterioration, depreciation; mechanical breakdown; insects, vermin, rodents, birds or other animals; corrosion, rust, dampness or dryness, . . .

. . . .

**F.    DEFINITIONS**

"Loss" means accidental loss or damage.

After hearing the parties' evidence, the trial court found that part of Dock C had collapsed as a result of a "windstorm" and "water damage" and, thus, was covered under Section A(4)(a), "Additional Coverage - Collapse," of the dock coverage form. The court ruled that because part of Dock C had suffered a collapse, the policy's exclusions set out in Section B did not apply. However, the trial court concluded that Docks A, B, and D had not suffered collapses. The court found that the damage to these docks resulted from causes excluded under Section B of the dock coverage form. The trial court entered judgment in

11

favor of Lower Chesapeake for the damage to Dock C in the amount of $500,000.

Lower Chesapeake appeals from the trial court's denial of coverage for the damage sustained by Docks A, B, and D.  Valley Forge assigns cross-error to the trial court's ruling that the policy provided coverage for the damage to Dock C.

The judgment of a trial court, sitting without a jury, is entitled to the same weight as a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.  Code § 8.01-680; Willard v. Moneta Bldg. Supply, Inc., 258 Va. 140, 149, 515 S.E.2d 277, 283 (1999); Cardinal Dev. Co. v. Stanley Constr. Co., 255 Va. 300, 302, 497 S.E.2d 847, 849 (1998).  The court's factual finding that part of Dock C sustained a collapse, while the other three docks did not, is central to the resolution of this appeal.  Lower Chesapeake argues that the evidence established that all four docks suffered collapses, while Valley Forge contends that none of the docks did.

Since the term "collapse" is not defined in the policy, the term must be given its ordinary and accepted meaning.  See Craig v. Dye, 259 Va. 533, 538, 526 S.E.2d 9, 11-12 (2000); Lumbermen's Mut. Cas. Co. v. Keller, 249 Va. 458, 460-61, 456 S.E.2d 525, 526 (1995).  An ordinary and accepted meaning of the word "collapse" is "to break down completely: fall apart in

12

confused disorganization: . . . disintegrate."  Webster's Third
New International Dictionary 443 (1993).

The trial court stated that it did not use "a dictionary
definition" of the term, but instead reviewed the photographs of
the damaged docks and the other evidence and concluded that the
damage to part of Dock C was "what the policy meant when it says
collapse."  The court also stated that it compared the
photographs of the other docks to the photographs of Dock C and
concluded that only Dock C satisfied the term "collapse" as set
forth in the policy.

Despite the trial court's statement that it did not rely on
a dictionary definition of the term "collapse," the court
properly applied the ordinary and customary meaning of that term
when reaching its conclusion.  The photographs and evidence to
which the trial court referred show that all the docks lost deck
boards and finger piers, and sustained various other minor
damage, but that only Dock C suffered a complete break, which
occurred at its "dogleg" angle.  A complete break of this nature
falls within the ordinary and customary meaning of the term
"collapse."  Thus, the trial court's conclusion that only one
section of Dock C had suffered a "collapse," within the meaning
of the policy term, is not plainly wrong or without evidence to
support it.

Next, we consider whether the exclusions listed in Section B of the dock coverage form preclude coverage for the damage sustained by Docks A, B, and D. The trial court made a factual finding that these docks did not suffer a collapse, and that the damage to these docks was caused by wind-driven water and gradual deterioration, which were excluded causes under Sections B(1)(e)(4) and B(3)(d) of the dock coverage form. Lower Chesapeake contends, however, that even if these docks did not suffer a "collapse," the policy covers losses sustained to those docks because Valley Forge failed to meet its burden of proving that this damage resulted from an excluded cause. In response, Valley Forge asserts that the trial court correctly found that the damage to these docks resulted, at least in part, from excluded causes.

Under the plain terms of Section B(1), coverage is excluded under the policy if a loss is caused "directly or indirectly" by one of the enumerated causes or events, "regardless of any other cause or event that contributes concurrently or in any sequence" to the loss. The evidence amply supports the trial court's finding that the damage to Docks A, B, and D resulted, at least in part, from the excluded causes of "[f]lood, . . . waves, tides, tidal waves, . . . all whether driven by wind or not," or from the excluded cause of "gradual deterioration," or from any combination of these excluded causes. Since the trial court's

14

factual finding on this issue is supported by the evidence, we will affirm that part of the judgment denying coverage under the policy for the damage to Docks A, B, and D.[*]

We next consider whether the trial court correctly concluded that the exclusions in Section B of the dock coverage form do not apply to losses encompassed within the provisions of the "Additional Coverage-Collapse" section of the form. Lower Chesapeake contends that the exclusions in Section B do not apply to losses resulting from a collapse, while Valley Forge asserts an opposite interpretation of the two sections of the policy.

Courts interpret insurance policies, like other contracts, in accordance with the parties' intentions as determined from the words they have used in their contract. Floyd v. Northern Neck Ins. Co., 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993). The interpretation of policy provisions presents a question of

---

[*]Lower Chesapeake also argues that the trial court erred in denying coverage for Docks A, B, and D because the evidence showed that the damage was caused by decay, not by gradual deterioration and, thus, Section B(3)(d) is inapplicable. Lower Chesapeake further contends, in essence, that because Valley Forge failed to conduct a "loss control survey" of the marina, as permitted by the policy, Valley Forge has forfeited any right to assert deterioration as an excluded cause of loss. However, the trial court based its denial of coverage to Docks A, B, and D on a finding that the damage to these docks was caused by deterioration and wind-driven water. Thus, we do not address these arguments since the trial court's finding that wind-driven water contributed to the damage is a sufficient reason to exclude coverage under the policy language.

15

law that we consider *de novo*.  Craig, 259 Va. at 537, 526 S.E.2d at 11.

When an insurer drafts policy language setting forth exclusions that limit coverage under a policy, the insurer is required to use language that clearly and unambiguously defines the scope of the exclusions.  See S.F. v. West Am. Ins. Co., 250 Va. 461, 465, 463 S.E.2d 450, 452 (1995); Granite State Ins. Co. v. Bottoms, 243 Va. 228, 233, 415 S.E.2d 131, 134 (1992); Smith v. Allstate Ins. Co., 241 Va. 477, 480, 403 S.E.2d 696, 697-98 (1991).  If exclusionary provisions are ambiguous, such that they may be understood in more than one way, we will interpret the policy in a manner that provides coverage.  S.F., 250 Va. at 464, 463 S.E.2d at 452; Granite State Ins. Co., 243 Va. at 234, 415 S.E.2d at 134; Smith, 241 Va. at 480, 403 S.E.2d at 697.

We conclude that the disputed policy language permits more than one reasonable interpretation of the applicability of Section B to collapse losses covered under Section A(4)(a).  As Lower Chesapeake notes, under Section B(3)(c) of the dock coverage form, losses resulting from collapse are specifically excluded from coverage "except as provided in the Additional Coverage-Collapse section of the Coverage Form."  Further, the exclusions set forth in Section B are specifically referenced in Section A(3), but Section A(4)(a) is silent regarding any such exclusions.  Based on these considerations, one reasonable

16

conclusion concerning the disputed policy language is that the Section B exclusions are inapplicable to the losses covered by Section A(4)(a).

In contrast, as Valley Forge observes, Section A(4)(a)(1) provides coverage for losses resulting from collapse caused by windstorm or water damage "all only as covered in the Coverage Form." Valley Forge contends that this language clearly subjects the collapse coverage of Section A(4)(a) to the other terms of the dock coverage form, including the exclusions set forth in Section B. Under these considerations, a second reasonable conclusion that can be drawn from the disputed language is that the Section B exclusions are applicable to the collapse of part of Dock C.

Because these provisions of the dock coverage form are ambiguous, we construe the policy in favor of providing coverage and hold that the exclusions in Section B are inapplicable to the collapse coverage of Section A(4)(a). The evidence supports the trial court's findings that the collapse of part of Dock C was caused by "windstorm" or "water damage" and, thus, that this collapse is included within the coverage provisions of Section A(4)(a). Therefore, we will affirm the trial court's judgment that the policy provides coverage for Lower Chesapeake's loss resulting from the collapse of part of Dock C.

17

Finally, Valley Forge argues that the evidence does not support the amount of damages awarded by the trial court for the damage sustained to Dock C. We agree. As stated above, Dock C sustained a complete break at its "dogleg" angle. This damage to a limited portion of Dock C was the only damage found by the trial court to have resulted from a collapse and, thus, to qualify for coverage under the policy.

Neither party presented evidence concerning the cost of repairing only the collapsed portion of Dock C. Instead, James Smith testified that it would cost $584,551 to completely replace Dock C, plus an additional amount to pay for debris removal. Jesse Brown testified that it would cost $991,014 to replace both Docks C and D entirely, except for one 16-foot section of Dock C that was salvageable. Therefore, the trial court's award of $500,000 in damages to Lower Chesapeake as compensation for its loss resulting from the collapse of a limited portion of Dock C is not supported by the evidence and must be set aside.

For these reasons, we will affirm in part, and reverse in part, the trial court's judgment and remand the case to the trial court for a determination of damages owed to Lower Chesapeake as a result of the collapse of part of Dock C.

Affirmed in part,
reversed in part,
and remanded.

18