Present:  All the Justices

TRANSCONTINENTAL INSURANCE COMPANY

v.  Record No. 002894

RBMW, INC., t/a JORDAN POINT
YACHT HAVEN, et al.

                              OPINION BY JUSTICE DONALD W. LEMONS
                                    September 14, 2001

ROBINS INSURANCE AGENCY, INC., et al.

v.  Record No. 002532

TRANSCONTINENTAL INSURANCE COMPANY, et al.

            FROM THE CIRCUIT COURT OF PRINCE GEORGE COUNTY
                        James A. Luke, Judge

    In this opinion we consider two appeals arising out of

the same case in the trial court.  In the first appeal, we

consider whether the trial court erred in ruling that an

exclusion in a Piers, Wharfs, and Docks Coverage Form ("PWD")

contained in an insurance policy issued by Transcontinental

Insurance Company ("Transcontinental") to RBMW, Inc. ("RBMW"),

t/a Jordan Point Yacht Haven ("Jordan Point") did not apply.

In the second appeal, we consider whether the trial court

erred in permitting RBMW to take a nonsuit of its cause of

action against Robins Insurance Agency, Inc. ("Robins

Insurance") and William Raleigh Robins ("Mr. Robins").

                    I. Facts and Proceedings Below

RBMW is a Virginia corporation which operates a marina known as Jordan Point on the James River near the Benjamin Harrison Bridge in Hopewell, Virginia. William Michael Winn ("Winn") is the president of RBMW and manages Jordan Point.

On March 20, 1995, Robins Insurance, through its agent Mr. Robins, sold a commercial package policy to RBMW. The policy included workers' compensation, automobile, property, general liability, and various other coverages, and was underwritten by Transcontinental. In addition, the policy offered the option of purchasing PWD coverage. RBMW purchased PWD coverage at an annual cost of $4,231.

The PWD policy provides in pertinent part:

> A. COVERAGE
>
> We will pay for "loss" to Covered Property from any of the Covered Causes of Loss.
>
> 1. COVERED PROPERTY, as used in this Coverage Form means:
>
>    a. Floating or fixed piers, wharfs and docks;
>
>         . . . .
>
> 3. COVERED CAUSES OF LOSS
>
>    Covered Causes of Loss means RISKS OF DIRECT PHYSICAL "LOSS" to Covered Property except those causes of "loss" listed in the exclusions.
>
> 4. a. ADDITIONAL COVERAGE – COLLAPSE

2

We will pay for direct "loss" caused by or resulting from risks of direct physical "loss" involving collapse of all or part of a building or structure caused by one or more of the following:

(1) Fire; lightning; windstorm; hail; explosion; smoke; aircraft; vehicles; riot; civil commotion; vandalism; breakage of glass; falling object; weight of snow, ice or sleet; water damage; all only as covered in the Coverage Form;

. . . .

B. EXCLUSIONS

1. We will not pay for a "loss" caused directly or indirectly by any of the following. Such "loss" is excluded regardless of any other cause or event that contributes concurrently or in any sequence to the "loss":

. . . .

e. WATER

. . . .

(4) Flood, surface water, waves, tides, tidal waves, overflowing of any body of water, or their spray, all whether driven by wind or not.

Additionally, the PWD policy defines "loss" as "accidental loss or damage." Transcontinental and RBMW agree that the Transcontinental policy, including PWD coverage, was in effect at the time of the loss on September 6, 1996.

3

In early September 1996, Hurricane Fran battered the east coast of the United States. On September 6, 1996, the storm reached Hopewell and severely damaged Jordan Point. RBMW submitted a claim to Transcontinental for $139,712.17. However, Transcontinental only paid $18,143.80 and denied the remainder of RBMW's claim relating to damage to its piers, wharves, and docks along with damage to a boathouse and replacement of a sign.[1]

On June 22, 1998, RBMW filed a motion for judgment in the trial court against Transcontinental, Robins Insurance, and Mr. Robins.[2] RBMW alleged Transcontinental breached its contract when it failed to pay the entire claim. Additionally, RBMW alleged, in the alternative, that Robins Insurance and Mr. Robins (collectively, "Robins") intentionally or negligently misrepresented to RBMW that storm damage was covered under the PWD policy.

---

[1] In its motion for judgment, RBMW stated that its damages totaled $139,712.17. This amount included the $18,143.80 that Transcontinental subsequently paid. Later, Transcontinental and RBMW stipulated that the amount of the damage claim that Transcontinental did not pay was $111,597.55.

[2] The motion for judgment named 18 defendants, including Robins Insurance, Mr. Robins, Transcontinental, and additional insurance companies. By stipulation, Transcontinental agreed that it underwrote the only insurance policy in question in this case and the trial court, with the exception of Robins Insurance, dismissed with prejudice the remaining 15 insurance companies.

4

At a bench trial on May 1, 2000, Winn testified concerning the damage that occurred to Jordan Point as a result of the hurricane. On cross-examination, the following colloquy took place between counsel for Transcontinental and Winn:

> Q: And also, as I understand from your deposition, the waves or the wave action on the boat did most of the damage to what occurred to the docks and to the boathouse?
>
> A: That was my opinion.

The trial court also viewed a video tape that was a compilation of different video tapes people took the night of the hurricane. Additionally, the trial court received as evidence the insurance policy, including the PWD form.

After Winn testified, counsel for Transcontinental and RBMW agreed that it was an appropriate time to argue whether the exclusions in Section B(1)(e)(4) of the PWD policy precluded coverage. The trial court concurred, "with the understanding that we are excluding from this [RBMW's] claim against Robins."

The trial court ultimately ruled that the exclusions in the PWD policy did not apply. Specifically, the trial court stated:

> the beginning of the rider under coverage, it says we'll pay for loss of covered property. For many of the covered causes, under covered

5

causes, we find subsection A to be floating or fixed piers, wharves, and docks.

In section 4 under A dealing with coverages, we get specific as to collapse, and it talked about direct loss caused by or resulting from a risk of direct physical loss, involving collapse of all or part of a building or structure caused by one or more of the following: And it lists several things; 2 of which are windstorm and water damage.

That gets us to the exclusions section. In number one under exclusions, it says we will not pay for a loss caused directly or indirectly by any of the following: Subsection E there says water.

And that gets us to the crux of this matter where under E4, it excludes flood, surface water, waves, tides, tidal waves overflowing of any body of water, or their spray, all [whether] driven by wind or not. The first word there is flood.

Black's Law Dictionary defines flood as an inundation of water over land not usually covered by it. And flood water is defined as water which escapes from a stream or other body and overflows adjacent territory.

By definition, this ain't a flood. Because the damage is over water where water not only flows, over the stream. In this case, the stream is rather large. It's the James River.

Then we get to waves and tides overflowing of any body of water. Turning to Black's again, overflow, the dictionary says, is to flow or spread beyond the limits. These piers and docks and wharves were not beyond the limits of the river. They were in the river. It can't be a flood. Its waves and tides were not beyond the limit; not up on the beach somewhere. It's in the river.

So if I were to take waves and tides, it's not those overflowing of the body of water.

Counsel for Transcontinental argued that under the clear language of the policy, "overflow is not a requirement for the

wave to be excluded" and suggested that, at the very least, the issue should be briefed before the trial court rendered a final decision.  However, the trial court disagreed, stating, "I don't see where anything is going to be gained by briefing it.  This thing is written with each one of these: Flood, surface, waves, tides, tidal waves.  Comma after each one. And then saying overflowing of any body of water."

After the trial court's ruling, counsel for RBMW stated the following:

> Your Honor, I don't think we have a further cause of action against the agency based on that ruling, and I suggest that they be allowed to leave.  If the court's ruling is that the coverage applies, then our allegation to the agency should have told us it didn't.  It's been decided by the court's opinion.

The trial court agreed and excused counsel for Robins from the remainder of the proceedings.

On May 8, 2000, counsel for Robins received a nonsuit order from RBMW that had not been endorsed by all counsel of record.  Robins filed a motion for entry of a dismissal order, asserting that because the trial court determined that there was coverage under the Transcontinental policy, Robins should be dismissed from the case with prejudice.  The trial court heard argument and issued a letter opinion on June 30, 2000, stating that it would permit RBMW to nonsuit Robins. Specifically, the trial court noted that RBMW's intentional or

7

negligent misrepresentation count against Robins had not been presented to the trial court for decision and therefore, under Code § 8.01-380, the granting of a nonsuit was appropriate. A July 26, 2000 order memorialized this decision.

Both Transcontinental and RBMW stipulated that the amount of the damage claim that Transcontinental did not pay was $111,597.55. On September 11, 2000, the trial court issued an order that reiterated its ruling that the exclusion in the PWD policy relied upon by Transcontinental did not apply and awarded RBMW $111,597.55 plus interest in damages.

Transcontinental and Robins appeal the respective adverse rulings of the trial court. In its brief before this Court, RBMW states that "[a]ll Jordan Point seeks is to retain its status quo in this case against Robins pending this Court's decision on the appeal of Transcontinental's case." RBMW merely seeks to "preserve its causes of action against Robins if this Court should reverse or remand the Judgment Order entered against Transcontinental."

## II. The PWD Coverage Exclusion

### a. Standard of Review

The trial court's determination that the exclusion in the PWD policy did not apply to the damage sustained by Jordan Point presents a mixed question of law and fact. The factual findings of the trial court are entitled to the same weight as

8

a jury verdict and will not be set aside unless it appears from the evidence that the judgment is plainly wrong or without evidence to support it.  Code § 8.01-680; <u>Cardinal Dev. Co. v. Stanley Constr. Co.</u>, 255 Va. 300, 302, 497 S.E.2d 847, 849 (1998).  However, interpretation of the provisions of an insurance contract presents a question of law that we consider de novo.  <u>See</u> <u>C.F. Garcia Enters., Inc. v. Enterprise Ford Tractor, Inc.</u>, 253 Va. 104, 107, 480 S.E.2d 497, 498-99 (1997).

### b. Analysis

The trial court heard testimony from Winn regarding the hurricane on Jordan Point and viewed a video tape depicting the same.  Neither RBMW nor Transcontinental disputes the events causing the damages sustained by Jordan Point and both parties stipulated to the amount of damages Transcontinental refused to pay.  Therefore, the only issue before us on appeal is the trial court's interpretation of the exclusions contained in Section B(1)(e)(4) of the PWD policy.

Both RBMW and Transcontinental assert on appeal that our recent decision in <u>Lower Chesapeake Assocs. v. Valley Forge Ins. Co.</u>, 260 Va. 77, 532 S.E.2d 325 (2000), governs the resolution of this case.  Transcontinental posits that in <u>Lower Chesapeake</u> we specifically upheld an exclusion, virtually identical to the one present in the case at bar,

9

holding that it was clear and unambiguous. RBMW disagrees and claims that we ruled in Lower Chesapeake that the exclusion was ambiguous when read in conjunction with the portion of the insurance policy regarding "Additional Coverage – Collapse." RBMW's interpretation of our decision in Lower Chesapeake is the more accurate of the two positions.

Lower Chesapeake involved a dispute over whether a PWD policy, virtually identical to the policy at issue in the present case, covered damage sustained during Hurricane Fran to four docks at a marina. Initially, we considered the meaning of the word "collapse" as it was used in Section A(4)(a), "Additional Coverage – Collapse," of the PWD policy. We applied the ordinary and customary meaning of the word as it was defined in the dictionary and held that "collapse" means " 'to break down completely: fall apart in confused disorganization: . . . disintegrate.' " Id. at 86, 532 S.E.2d at 330 (quoting Webster's Third New International Dictionary 443 (1993)). Under this definition, only part of one dock in Lower Chesapeake suffered a "collapse." Id. at 86-87, 532 S.E.2d at 331.

In Lower Chesapeake, we also considered the application of the exclusions in the PWD policy. We held that the damage incurred by the docks that were battered by the storm, but did not collapse, resulted from excluded causes. Id. at 87, 532

10

S.E.2d 331. Specifically, we said that the evidence amply supported the trial court's finding that the damage to these docks "resulted, at least in part, from the excluded causes of '[f]lood, . . . waves, tides, tidal waves, . . . all whether driven by wind or not.' " Id. As to the one dock that suffered a "collapse," Valley Forge, the insurance carrier, argued that the same exclusions that nullified coverage to the docks that had not collapsed applied to the dock that did. Id. We disagreed, holding that "[b]ecause these provisions of the dock coverage form are ambiguous, we construe the policy in favor of providing coverage and hold that the exclusions in Section B are inapplicable to the collapse coverage of Section A(4)(a)[Additional Coverage – Collapse]." Id. at 88, 532 S.E.2d at 332. We based this decision on the fact that the disputed policy language permitted more than one reasonable interpretation of the application of the exclusion provision in Section B to the collapse provision in Section A(4)(a). Id.

The trial court's decision in the present case occurred about one month prior to our decision in Lower Chesapeake. Despite RBMW's argument that they were covered by either direct loss caused by the storm or collapse of structures due to windstorm, the trial court made no factual findings regarding collapse. Instead, the trial court merely held that

11

the exclusion in Section B(1)(e)(4) did not apply to RBMW's claims.  Therefore, on appeal, we consider only the trial court's interpretation of this exclusion.

In general, "[c]ourts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document."  Floyd v. Northern Neck Ins. Co., 245 Va. 153, 158, 427 S.E.2d 193, 196 (1993).  Each component of an insurance contract "should be considered and construed together and seemingly conflicting provisions harmonized when that can be reasonably done, so as to effectuate the intention of the parties as expressed therein."  Suggs v. The Life Ins. Co. of Virginia, 207 Va. 7, 11, 147 S.E.2d 707, 710 (1966).  When a policy does not define a given term, we give the word its "ordinary and accepted meaning."  Scottsdale Ins. Co. v. Glick, 240 Va. 283, 288, 397 S.E.2d 105, 108 (1990).

With regard to the exclusions in the PWD coverage, our consideration is governed by well-settled principles.

> Exclusionary language in an insurance policy
> will be construed most strongly against the
> insurer and the burden is upon the insurer to
> prove that an exclusion applies.  Reasonable
> exclusions not in conflict with statute will be
> enforced, but it is incumbent upon the insurer
> to employ exclusionary language that is clear
> and unambiguous.

12

American Reliance Ins. Co. v. Mitchell, 238 Va. 543, 547, 385

S.E.2d 583, 585 (1989) (internal citations omitted).

Exclusion B(1)(e)(4) excludes from coverage direct or

indirect loss caused by "[f]lood, surface water, waves, tides,

tidal waves, overflowing of any body of water, or their spray,

all whether driven by wind or not."  Initially, the trial

court found that the damage to Jordan Point was not caused by

a flood.[3]

However, instead of considering the remaining excluded

causes of loss on an individual basis, the trial court read

the exclusion as if the phrase "overflowing of any body of

water" modified the words "flood," "surface water," "waves,"

"tides," and "tidal waves."  As such, the trial court held

that because the waves and tides were "not beyond the limits

of the river," they were not "overflowing of the body of

water."[4]

---

[3] The trial court based its finding on the fact that
Black's Law Dictionary defined "flood" as "an inundation of
water over land not usually covered by it."  This definition
is found in the sixth edition of Black's.  The seventh, and
most current, edition does not contain a definition for
"flood."  However, Webster's Collegiate Dictionary defines
"flood" as "a rising and overflowing of a body of water esp.
onto normally dry land."

[4] The trial court stated that Black's defines "overflow"
as "to flow or spread beyond the limits."  Neither the sixth
nor seventh edition of Black's contains a definition for
"overflow."  Because we disagree with the trial court's
grammatical reading of the exclusion, we need not consider

13

We disagree with this grammatical construction of the exclusion.  Contrary to the trial court's finding, the placement of commas in the exclusion indicates that each subject matter must be separately considered, including, "overflowing of any body of water."  In this context, the phrase, "overflowing of any body of water," is a verbal noun known as a gerund.  See William Strunk, Jr. & E.B. White, The Elements of Style 55 (4th ed. 2000).  Accordingly, the trial court erred in failing to consider each of the excluded causes of loss on an individual basis to determine whether coverage was excluded.

Having determined that the damage to Jordan Point did not result from a "flood," the trial court should then have considered the remaining excluded causes in Section B(1)(e)(4) separately, starting with a "wave."  A "wave" is defined in Webster's Collegiate Dictionary as "a moving ridge or swell on the surface of a liquid (as of the sea)."  Significantly, unlike a "flood," a "wave" does not require movement of water into an area not typically covered by it.  It is clear that the damage to Jordan Point was caused, at least in part, by waves.  Winn admitted that, in his opinion, waves did most of the damage to the docks and the boathouse.  We therefore hold

---

whether "to flow or spread beyond the limits" is the ordinary or accepted meaning of "overflow."

14

that the trial court erred in ruling that exclusion B(1)(e)(4) by its terms did not apply to any of the damage to Jordan Point.

Obviously, the trial court determined that the losses sustained by Jordan Point were covered losses; however, the trial court did not determine whether the losses were covered by provisions A(1),(2), and (3) or by the additional coverage for collapse provided by A(4)(a). The significance is readily apparent in light of our decision in Lower Chesapeake, involving virtually identical policy language, wherein we held that "the exclusions in Section B are inapplicable to the collapse coverage of Section A(4)(a)." Lower Chesapeake, 260 Va. at 88, 532 S.E.2d at 332. Accordingly, we will reverse the judgment of the trial court and remand for determination of the source of coverage and proper application of exclusions.

### III. RBMW's Nonsuit

#### a. Standard of Review

On appeal, Robins maintains that the trial court erred in permitting RBMW to take a nonsuit of its claim against Robins. This issue presents a question of law and as such is reviewed on appeal under a de novo standard.

#### b. Analysis

Code § 8.01-380(A) provides in pertinent part:

15

A party shall not be allowed to suffer a nonsuit as to any cause of action or claim, or any other party to the proceeding, unless he does so before a motion to strike the evidence has been sustained or before the jury retires from the bar or before the action has been submitted to the court for decision.

We have stated, when construing the nonsuit statute, that for an action to be "submitted to the court," it is "necessary for the parties, by counsel, to have both yielded the issues to the court for consideration and decision." Moore v. Moore, 218 Va. 790, 795, 240 S.E.2d 535, 538 (1978). We stated that this could be accomplished "either as the result of oral or written argument, formal notice and motion, or by tendering a jointly endorsed sketch for a decree." Id. at 795-96, 240 S.E.2d at 538. However, in City of Hopewell v. Cogar, 237 Va. 264, 268, 377 S.E.2d 385, 387-88 (1989), we stated that "[i]n Moore, we made no attempt to delineate every possible situation when an action would or would not be 'submitted' to the court for decision under the nonsuit statute."

We have previously approved a trial court's granting of a nonsuit even though motions had been presented to the court and argument had occurred. See Kelly v. Carrico, 256 Va. 282, 286, 504 S.E.2d 368, 370 (1998)(holding that there was no submission because the motion for nonsuit was made before the court recessed after oral argument to consider the merits of the motion for judgment on the pleadings); Cogar, 237 Va. at

16

267, 377 S.E.2d at 387 (holding that there was no submission because the motion for nonsuit was made within period allowed by court, after oral argument, for litigants to file additional memoranda in support of their positions on a motion for summary judgment).

In the present case, RBMW's motion for judgment contained alternative causes of action against different parties: breach of contract against Transcontinental, and intentional or negligent misrepresentation against Robins. In response, both Transcontinental and Robins submitted separate grounds of defense. At trial, Transcontinental argued that the exclusion in the PWD policy operated to preclude coverage. Prior to hearing argument on this issue, the trial court specifically noted that the claims against Robins were being excluded from consideration at this point. Indeed, as counsel for RBMW noted, "I don't think they have a dog in this fight, this particular fight." The trial court astutely noted, "[n]ot in this particular one." Following the trial court's decision, Robins did not present any argument to the trial court. Instead, Robins was "excused from the remainder of the proceedings."

Therefore, at no time was the issue of RBMW's cause of action against Robins yielded by both Robins and RBMW to the trial court for consideration and decision. The only issue

17

considered by the trial court was the application of the exclusion in the PWD policy; an issue only Transcontinental and RBMW yielded to the trial court for consideration and decision.  Accordingly, we hold that RBMW's action against Robins had not been "submitted to the court for decision" within the meaning of Code § 8.01-380(A).

Robins also claims that RBMW should not have been permitted to suffer a nonsuit because the trial court had already made a ruling that was dispositive as to the cause of action against Robins.  For support of this proposition, Robins relies upon our decision in Wells v. Lorcom House Condominiums' Council of Co-Owners, 237 Va. 247, 377 S.E.2d 381 (1989).  In Wells, the plaintiff and defendants had argued before the trial court defendants' demurrer attacking the legal sufficiency of an amended motion for judgment, defendants' plea in bar based on various statutes of limitations, and defendants' motion to dismiss.  Id. at 252, 377 S.E.2d at 384.  The trial court took the matters "under advisement."  Id. at 250, 377 S.E.2d at 382.  The plaintiff requested a nonsuit before the trial court issued its ruling, but we held that the request came too late, noting:

> Any one of those pleadings were case
> dispositive if the court ruled in favor of the
> defendants.  Moreover, the record is clear that
> no one, neither the trial judge nor the
> attorneys, contemplated that any further

18

action, such as briefing, was necessary in order to enable the court to decide the issues.

Id. at 252, 377 S.E.2d at 384. Robins also points to RBMW's counsel's assertion, following the trial court's ruling on the applicability of the exclusion in the PWD policy, that RBMW did not have a further cause of action against Robins. Wells is distinguished from the present case. Unlike Wells, where all parties had presented argument to the court on all issues, in the case at bar, RBMW and Robins never yielded the issue of Robins' alleged intentional or negligent misrepresentation to the trial court.

## IV. Conclusion

The trial court did not err in granting a nonsuit of RBMW's claims against Robins. The trial court erred in its interpretation of the exclusion in the applicable policy. We will affirm the trial court's judgment in the case of Robins v. Transcontinental (Record No. 002532) and will reverse the trial court's judgment in Transcontinental v. RBMW (Record No. 002894) and remand for further proceedings consistent with this opinion.

Record No. 002894 — Reversed and remanded.
Record No. 002532 — Affirmed.