## CIRCUIT COURT OF ARLINGTON COUNTY

US Airways, Inc., et al.

v.

Commonwealth Ins. Co. et al.

July 23, 2004

Case No. (Law) 03-587

BY JUDGE JOANNE F. ALPER

This case comes before the Court on US Airways's Motion for Judgment against PMA Capital Insurance Company alleging breach of an insurance contract. US Airways claims damages as a result of business interruption caused by the nationwide ground stop orders issued by the Federal Aviation Administration and the closure of Reagan National Airport in the wake of the terrorist attacks on September 11, 2001.

US Airways Group, Inc., entered into an insurance contract with several insurers for property liability insurance. The Policy is a subscription policy, where several insurance providers jointly agree to underwrite a percentage of coverage, with a limit of $25 million. The Policy does not cover aircraft or personal injury liability. This case involves only one of the insurers under the Policy, PMA Capital Insurance Company (" PMA" ). PMA is a successor in interest to Caliber One Indemnity Company, who was one of the original subscribers to the Policy.

On May 14, 2004, this Court issued rulings on cross-motions for summary judgment. In denying PMA's motion for summary judgment, the Court found

that actual damage to US Airways's property is not a condition precedent to recovery for business interruption under the Policy. Rather, the Court found that the Policy was clear and unambiguous on its face and a jury could find, under the facts presented, coverage applied under the civil or military intervention provisions.[2]

The Court sustained PMA's motion for summary judgment finding that US Airways could not recover for loss of market share as the Policy explicitly excludes recovery for such a loss. PMA sought summary judgment on the issue of whether US Airways submitted a valid proof of loss for the claim which was denied.

Summary judgment was granted in favor of PMA on the issue of US Airways's claim of breach of the covenant of good faith and fair dealing. The law in Virginia supports the Court's finding that US Airways cannot seek recovery for bad faith in the current litigation. The Court dismissed the claim, without prejudice, as premature.

The final issue raised in the May 14th ruling was whether PMA can offset any damages under the Policy with funds received by US Airways from the Federal government under the Air Transportation Safety and System Stabilization Act. The Court found that US Airways is required to offset any insurance proceeds from any claim under the Stabilization Act, but that does not require US Airways to offset the federal payments from its claims for coverage under the business interruption Policy. Therefore, the Court granted summary judgment in favor of US Airways.

Based on these rulings, the Court heard this matter, without a jury, on the sole issue of whether US Airways' claim was covered under the Policy.[3] Having taken evidence, considered the arguments of counsel, and taken the matter and PMA's Motion to Strike the Plaintiff's Evidence under advisement, the Court issues the following findings of facts and conclusions of law.

## Findings of Fact[4]

US Airways Group, Inc., entered into a property insurance contract with Caliber One Indemnity Company (the "Policy") which provides for coverage for the period of December 1, 2000, through December 1, 2001.*

---

[2] US Airways did not file a motion for summary judgment on the issue of coverage; the Court was only proceeding on PMA=s motion.

[3] The issue of damages has been reserved to be heard by a jury if the Court finds that US Airways=s claim is covered under the Policy.

[4] Each finding of fact marked with an * represents a finding to which the parties agree since neither party has stated an objection to that finding.

The Policy states that coverage extends to US Airways Group, Inc., "and any subsidiary, associated, or affiliated company, corporation, firm, organization, partnership, joint venture, or individual as now exist or are hereafter constituted or acquired, and any other party in interest that is required by contract or other agreement to be named, hereafter referred to as the >Insured'."

The Policy is a subscription policy which covers damage to property, including business interruption, up to a limit of $25 million.

The Policy does not cover loss or damage to aircraft.

PMA Capital Insurance Corporation became a party to this action as a successor in interest to Caliber One Indemnity Company.*

The relevant sections of the Policy are as follows:

## 7. COVERAGE
Except as hereinafter excluded, this policy covers:

A. *Real and Personal Property*

1. The interest of the Insured in all real and personal property (including improvements and betterments) owned, used, or intended for use by the Insured, or hereafter constructed, erected, installed, or acquired including while in course of construction, erection, installation, and assembly. . . .

B. *Business Interruption*

1. Loss resulting from necessary interruption of business conducted by the Insured and caused by loss, damage, or destruction to real or personal property by any of the perils covered herein during the term of this policy. . . .

5. Resumption of Operations: It is a condition of this insurance that, if the Insured could reduce the loss resulting from the interruption of business:

(a) by a complete or partial resumption of operation of the property insured, whether damaged or not. . . .

F. *Provision Applicable to Business Interruption*. . . .

5. Interruption by Civil or Military Authority: This policy extended to cover the loss sustained during the period of time, not to exceed 30 consecutive days when, as a direct result of a peril insured against, access to real or personal property is prohibited by order of civil or military authority.

## 8. PERILS INSURED AGAINST

This policy insures against all risk of direct physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded. . . .

## 9. PERILS EXCLUDED

This policy does not insure. . . .against loss of market, except as provided for elsewhere in this policy.

### Notice of Loss

As soon as practicable after any loss or damage occurring under this policy is known to the Insured's home office insurance department, the Insured shall report such loss or damage with full particulars to Aon Risk Services, Inc., of IL. . . .

### Proof of Loss

It shall be necessary for the Insured to render a signed and sworn proof of loss to the Company or its appointed representative stating: the place, time, and cause of the loss, damage, or expense; the interest of the Insured and of all others; the value of the property involved in the loss; and the amount of loss, damage, or expense. . . .

### 34. Assistance and Cooperation of the Insured

The insured shall cooperate with this Company and, upon this Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits. . . .

### 38. Suit Against the Company

No suit or action on this policy for the recovery of any claim shall be sustainable in any court of law or equity unless the Insured shall have fully complied with all the requirements of this policy. The Company agrees that any action or proceeding against it for recovery of any loss under this policy shall not be barred if commenced within the time prescribed therefor in the statutes of [the] State of New York.

On September 11, 2001, terrorists launched an attack on the United States in which commercial aircraft were hijacked and used as weapons.

US Airways sought coverage under the Policy for losses related to the shut down of the national airspace and the closure of Reagan National Airport as a result of the terrorist attacks on the United States on September 11, 2001.

US Airways bases its claim for business interruption coverage on the "Interruption by Civil or Military Authority" provision in the Policy.*

On September 11, 2001, the Department of Transportation (" DOT" ), through the Federal Aviation Administration (" FAA" ), issued a national ground stop order which closed the entire national airspace in the United States for the first time.*

The routine method of communication between the FAA and US Airways is via teletype sent by the FAA from the FAA Command Center located in Herndon, Virginia, to the US Airways Operations Command Center (" OCC" ) located in Pittsburgh, Pennsylvania. Another method of communication between the FAA and US Airways is via telephone conference calls every two hours between the FAA Command Center in Herndon, Virginia, and the US Airways OCC.*

On September 11, 2001, US Airways's OCC received the national ground stop order from the FAA. US Airways's OCC forwarded the FAA national ground stop order to US Airways' operations personnel, including personnel at all subsidiary airlines, at each airport from which US Airways operated flights.*

The FAA ground stop order prohibited any aircraft from departing from designated airports.*

All commercial air traffic ceased in each of US Airways's stations as a direct consequence of the FAA ground stop order.*

The Metropolitan Washington Airport Authority ordered Reagan National Airport terminals closed to the public and ordered personnel to exclude public access to the Airport facilities. Reagan National Airport remained close to the public and all airport employees, but for only a select few for security purposes, until October 4, 2001.

The national ground stop implemented by the FAA on September 11, 2001, remained in effect through 11:00 a.m. E.S.T. on September 13, 2001.*

After the landing of its aircraft following the ground stop, US Airways did not operate any commercial flights until the ground stop was lifted on September 13, 2001.*

US Airways's only business is the transportation of people and cargo by aircraft.*

Each airport in the United States remained closed to commercial air traffic until September 13, 2001.*

US Airways sustained business interruption losses as a result of the FAA ground halt order which closed the national airspace for the period of September 11, 2001, to September 13, 2001.

Reagan National Airport was closed to all commercial air traffic from September 11, 2001, to October 4, 2001, when it partially resumed commercial operations.*

During the closure of Reagan National Airport, officials for MWAA installed locks on the doors and maintained a security presence to bar not only the public but most airport personnel from the premises.

US Airways sustained business interruption losses as a result of the orders of civil and military authority which closed Reagan National Airport for the period of September 11, 2001, to October 4, 2001.*

The Federal Aviation Administration, the Department of Transportation, and the Metropolitan Washington Airport Authority are civil authorities within the meaning of the Policy.*

On October 26, 2001, US Airways provided Caliber One with notice of its intent to file a business interruption claim under the Policy.

On July 30, 2002, US Airways submitted an amended Proof of Loss to Caliber One claiming losses under the policy as the insured "US Airways, Inc."

*Conclusions of Law*[5]

*The Policy*

In Virginia, insurance policies are construed in accordance with traditional principles of contract law. *Floyd v. Northern Neck Ins. Co.*, 245 Va. 153, 427 S.E.2d 193 (1993). To that end, polices must be read as a whole. *American Spirit Ins. Co. v. Owens*, 261 Va. 270, 541 S.E.2d 553 (2001). In reading an insurance contract, as a whole, each component of the insurance contract must be considered. *Virginia Farm Bur. Mut. Ins. Co. v. Frazier*, 247 Va. 172, 440 S.E.2d 898 (1994). When the language in a policy is clear and unambiguous, the language will be given its plain and ordinary meaning and enforced as written. *Partnership Umbrella, Inc. v. Federal Ins. Co.*, 260 Va. 123, 530 S.E.2d 154 (2000).*

Multiple related components of an insurance contract must be construed together and seemingly conflicting provisions harmonized when that can

---

[5] Each conclusion of law marked with an * represents a proposition to which the parties agree since neither party has stated an objection to that conclusion.

reasonably be done.* *Transcontinental Ins. Co. v. RBMW, Inc.*, 262 Va. 502, 551 S.E.2d 313 (2001).

The agreement entered into between US Airways and Caliber One Insurance Company is a valid contract.*

The Policy before the Court is plain and unambiguous by its terms.*

*Coverage Under the Policy*

In order for this Court to find coverage under the Policy, US Airways must demonstrate, by a preponderance of the evidence, that a civil or military authority issued an order which caused a denial of access to US Airways's property and that order was issued as a direct result of a peril insured against.

"Peril insured against" is defined in the Policy as "all risk of direct physical loss of or damage to property described herein including general average, salvage, and all other charges on shipments covered hereunder, except as hereinafter excluded." *

PMA concedes that, as a result of the orders of civil and military authorities, the national airspace was closed from September 11, 2001, through September 13, 2001, and that Reagan National Airport was closed for the period of September 11, 2001, through October 4, 2001.

PMA asserts that the orders were not issued as a direct result of a peril insured against and therefore coverage under the Policy should be denied.

At trial, US Airways put forth evidence that established that Reagan National Airport was closed as a direct result of fear that United Flight 93 was heading for the airport. One computer generation had the aircraft less than twenty minutes away and heading directly for National Airport. At the time of the evacuation, Christopher Brown, airport manager of Reagan National Airport, testified that it was his understanding that Reagan National Airport could be a target of a terrorist attack. In addition to the large number of people on the premises, the fuel storage facility, holding about four million gallons of jet fuel, was thought to have been a target.

The order to close Reagan National Airport was made specifically out of fear of being a target for further terrorist attacks. Closing the premises acted to protect the property of not only US Airways, but all of the other commercial and private operators at the airport.

The Policy does not require actual damage or loss of property to invoke coverage.

It is clear from the evidence that an order by civil or military authority was issued as a direct result of risk of damage or loss to US Airways property. As counsel for PMA acknowledged during closing arguments, coverage would apply if MWAA closed Reagan National Airport, denying access to the

premises, during a thunderstorm because lightning struck a building next to the airport and a fire threatened US Airways' property. The same is true here, MWAA closed Reagan National Airport out of a fear that a hazard existed and the remedy was to evacuate the premises and deny access not only to the public but also airline employees.

Since MWAA's orders denied access to Reagan National Airport and denied "access to real or personal property" of US Airways, the orders qualify under the Civil Authority provision of the Policy.

Likewise, the ground stop order issued by the FAA closing the nation's airspace clearly denied US Airways use of its property and prohibited US Airways from operating its business which is the transportation of passengers and cargo by aircraft.

Based upon the evidence presented, the Court finds that the events of September 11, 2001, and the resulting closure of the national airspace until September 13, 2001, and the continued closure of Reagan National Airport until October 4, 2001, are covered events under the Policy.

The Court, as a matter of law, must now determine whether US Airways satisfied the conditions precedent to recovery under the Policy or determine whether PMA waived those conditions.

*Proof of Loss*

The Policy requires that "[a]s soon as practicable after any loss or damage occurring under this policy is known to the Insured's home office insurance department, the Insured shall report such loss or damage with full particulars to Aon Risk Services, Inc., of IL. . . ."

It is established law in Virginia that "such a requirement of timely notice of an accident or occurrence is a condition precedent to an insurance company's liability coverage requiring >substantial compliance by the insured'." *Liberty Mut. Ins. Co. v. Safeco Ins. Co. of Am.*, 223 Va. 317, 323, 288 S.E.2d 469, 473 (1982). The Supreme Court has held that "if a violation of the notice requirement is substantial and material, the insurance company need not show that it was prejudiced by such a violation," rather, only a showing that notice was not given is sufficient to prove the condition precedent was satisfied. *State Farm Fire & Cas. Co. v. Scott*, 236 Va. 116, 120, 372 S.E.2d 383, 385 (1988).

PMA admits that it received notice from US Airways of their intent to file a claim under the Policy on October 26, 2001. This admission provides adequate basis for the Court to rule that US Airways satisfied the notice requirement under the Policy.

In addition to submitting a notice of claim, US Airways was required to submit a proof of loss under the Policy.

The Policy provides: "It shall be necessary for the Insured to render a signed and sworn proof of loss to the Company or its appointed representative stating: the place, time, and cause of the loss, damage, or expense; the interest of the Insured and of all others; the value of the property involved in the loss; and the amount of loss, damage, or expense."

When determining whether an insured has submitted a valid proof of loss, the settled law of this Commonwealth is that "if an insurance policy makes the furnishing of a proof of loss a condition precedent to an action upon it, performance or waiver of it must be shown before a recovery can be had." *Aetna Cas. & Sur. Co. v. Harris*, 218 Va. 571, 578, 239 S.E.2d 84, 88 (1977). The purpose of the proof of loss is to enable the insurer to investigate the insured's losses, to estimate its rights and liabilities, and to prevent assertion of fraudulent or unjust claims. *Allstate Ins. Co. v. Charity*, 255 Va. 55, 59, 496 S.E.2d 430, 431-32 (1998). The burden of proving that a valid proof of loss was submitted rests upon the insured to "[prove] compliance with the necessary requirements of an insurance policy as to proof of loss, or the waiver of such compliance on the part of the company ... if [the insured] fails to establish the same by a preponderance of the evidence his action must fail." *Aetna Cas. & Sur. Co. v. Harris*, 218 Va. 571, 578, 239 S.E.2d 84, 88 (1977).

PMA admits that it received a proof of loss from US Airways on July 29, 2002, and an amended proof of loss on July 30, 2002.

The proof of loss submitted on July 30, 2002, stated that the Insured, US Airways, Inc., sustained business interruption losses from on September 11, 2001, through September 13, 2001, for its entire fleet and losses associated with the closure of Reagan National Airport from September 11, 2001, through October 4, 2001.

The proof of loss estimated damages of $58,199,634. That damage estimate included an asterisk which indicated that the loss figure specifically did not include the losses suffered by the covered subsidiary airlines.

The question before the Court is whether the proof of loss submitted to PMA was for US Airways alone or whether it was for US Airways Group, Inc., the named insured in the Policy, which includes the mainline carrier and its four subsidiaries, Allegheny Airlines, Inc., Piedmont Airlines, Inc., PSA Airlines, Inc., and MidAtlantic Airways, Inc.

PMA has asserted throughout the litigation that the language in the proof of loss explicitly excludes the subsidiaries within US Airways' claim, while US Airways contends that since the loss exceeds the policy limit by two fold, the failure to give the dollar amount of the US Airways subsidiaries' losses was neither a substantial nor material omission.

The law in Virginia is clear that "liability is determined by the loss itself, the policy's coverage restrictions, and the limits of the policy, not by the dollar amount the insured places on the proof of loss." *Allstate Ins. Co. v. Charity*, 255 Va. 55, 59, 496 S.E.2d 430, 431-32 (1998). "Not knowing the dollar amount of the insured's claim does not affect the ability of the insurance company to determine the amount of its liability." *Id.*

The Policy, clearly and unambiguously, covers not only US Airways but all of its subsidiaries.

PMA clearly knew the nature of the claim from the notice submitted on October 26, 2001, and the proof of losses submitted on July 29 and 30, 2002.

The proof of loss was filed under the name of the insured, the proof of loss refers to the policy, by number, which covers both the mainline carrier and the subsidiaries, and the proof of loss clearly references the four subsidiaries.

Since the damages well exceeded the Policy limits, it would have been a futile effort to require US Airways to extract the exact amount of damages for each subsidiary when PMA was clearly put on notice that subsidiaries also experienced losses as a result of business interruption.

At trial, PMA did not present any evidence of prejudice based upon the omission of the subsidiaries' losses.

It is clear from the record that the notice of claim and proof of loss provides PMA with sufficient information "to investigate the loss, to determine its liability, and to prevent a fraudulent claim." *See Allstate Ins. Co. v. Charity*, 255 Va. 55, 496 S.E.2d 430 (1998); *Seaboard Fire & Marine Ins. Co. of New York v. Hurst*, 186 Va. 21, 41 S.E.2d 495 (1947).

Based upon the evidence presented, the Court finds that PMA was given sufficient information to investigate the claim, and the proof of loss submitted by US Airways on July 30, 2002, was valid for not only US Airways mainline carrier, but also the four subsidiaries included in the Policy.

*Cooperation Clause*

The Policy requires: "The insured shall cooperate with this Company and, upon this Company's request and expense, shall attend hearings and trials and shall assist in effecting settlements, in securing and giving evidence, in obtaining the attendance of witnesses, and in conducting suits." PMA argues that US Airways failed to cooperate with the investigation of its claim and, as a result, has breached the Policy.

If US Airways failed to cooperate in the investigation of the claim, that inaction could constitute breach and relieve PMA of any liability under the Policy. In evaluating an allegation of failure to cooperate with an insurer, the

Supreme Court has stated "there must be a lack of cooperation in some substantial and material respect." *Cooper v. Employers Mut. Liab. Ins. Co. of Wisconsin*, 199 Va. 908, 913-14, 103 S.E.2d 210, 214 (1958). (The Court's ruling was partially overturned by the General Assembly in 1966. The General Assembly enacted Virginia Code § 38.1-381, codified as § 38.2-2204, which requires a showing of prejudice in relation to liability insurance on motor vehicles, aircraft, and watercraft.)

During its investigation, Caliber One requested that US Airways provide it with certain factual and documentary information so that Caliber One could render a coverage determination.*

At trial, PMA did not present any evidence to demonstrate that US Airways failed to cooperate with the investigation of the claim.

Based on the evidence, the Court finds that US Airways did not breach it duty to cooperate under the Policy.

## Conclusion

For the foregoing reasons, PMA's Motion to Strike is denied. The Court finds that US Airways's claim for business interruption is covered by the Policy and that US Airways has satisfied all of the necessary conditions precedent to move for recovery.

This case is continued until September 20, 2004, for a trial, before a jury, on the issue of damages.