UNPUBLISHED

# UNITED STATES COURT OF APPEALS

## FOR THE FOURTH CIRCUIT

PARK CENTER III LIMITED
PARTNERSHIP; PARK CENTER III,
L.L.C.; LENNAR PARK CENTER III
HOLDINGS, INCORPORATED;
ALEXANDRIA, LP, INCORPORATED;
LNR PROPERTY CORPORATION,
            *Plaintiffs-Appellees,*

            v.

PENNSYLVANIA MANUFACTURERS'
ASSOCIATION INSURANCE COMPANY,
            *Defendant-Appellant.*

No. 01-1649

PARK CENTER III LIMITED
PARTNERSHIP; PARK CENTER III,
L.L.C.; LENNAR PARK CENTER III
HOLDINGS, INCORPORATED;
ALEXANDRIA, LP, INCORPORATED;
LNR PROPERTY CORPORATION,
            *Plaintiffs-Appellants,*

            v.

PENNSYLVANIA MANUFACTURERS'
ASSOCIATION INSURANCE COMPANY,
            *Defendant-Appellee.*

No. 01-1668

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Albert V. Bryan, Jr., Senior District Judge.
(CA-00-1459-A)

Argued: December 6, 2001

Decided: February 22, 2002

Before WILKINSON, Chief Judge, and MICHAEL and
TRAXLER, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by unpublished per
curiam opinion.

---

**COUNSEL**

**ARGUED:** Geoffrey Stetson Gavett, GAVETT & DATT, P.C.,
Rockville, Maryland, for Appellant. Gaspare Joseph Bono, LONG,
ALDRIDGE & NORMAN, L.L.P., Washington, D.C., for Appellees.
**ON BRIEF:** Douglas A. Datt, Rhoda S. Barish, GAVETT & DATT,
P.C., Rockville, Maryland, for Appellant. Dennis A. Davison, John L.
Watkins, Russell J. Rogers, LONG, ALDRIDGE & NORMAN,
L.L.P., Washington, D.C., for Appellees.

---

Unpublished opinions are not binding precedent in this circuit. See
Local Rule 36(c).

---

**OPINION**

PER CURIAM:

Park Center III Limited Partnership and other entities (collectively
Park Center) brought this diversity action against the Pennsylvania
Manufacturers' Association Insurance Company (PMA) seeking
recovery on an insurance policy issued to Park Center by PMA. The
insurance policy covered a four-building apartment complex in Alex-
andria, Virginia (the Project), owned by the various Park Center enti-

ties. The Project was under construction on September 16, 1999, when Hurricane Floyd struck the greater Washington, D.C., metropolitan area, including Alexandria, causing extensive damage. PMA denied coverage for Park Center's claimed losses, asserting that the items damaged by Floyd had already deteriorated and needed replacement prior to Floyd. Park Center sued in federal court seeking coverage for its damaged property as well as attorneys' fees and costs. Following a three-day bench trial the district court held that the policy provided coverage to Park Center for most of its claimed losses but denied its claim for attorneys' fees. PMA appeals certain aspects of the district court's judgment, and Park Center cross-appeals the court's denial of attorneys' fees. We affirm the district court's judgment for the most part, but we remand for a recalculation of Park Center's damages for replacing the two layers of gypsum sheathing with one layer of gypsum and one layer of Tyvec.

## I.

The PMA policy insuring the Project is an "all risk" policy covering all physical losses to the covered property except losses specifically excluded. Policy § A.3. The parties agree that Hurricane Floyd was a fortuitous event not excluded by the policy.

The apartment buildings were constructed of a light gauge steel frame covered with two layers of gypsum panels, which were in turn to be covered with an exterior cladding. Gypsum panels cannot be left uncovered during the construction process for long periods of time because they do not withstand extended exposure to weather conditions. The parties dispute precisely how long gypsum panels may be exposed before they deteriorate to the point that they must be replaced. PMA presented evidence of a national standard recommending that gypsum panels not be exposed to the elements for more than 30 days. Park Center presented evidence that this 30-day limit is at best a rough benchmark that is routinely violated in the D.C. metropolitan area and that the conditions of particular gypsum panels depend on the actual weather conditions during the time of exposure. Park Center also presented evidence that the summer of 1999 was an exceptionally dry summer in the northern Virginia area.

When Floyd passed through the area on September 16, 1999, the gypsum panels had not yet been covered by the exterior cladding and

had been exposed to the elements for 90 days or longer. Several months before the hurricane, Erkiletain Construction Corporation, the original general contractor on the Project, had determined that the gypsum panels on one of the buildings had deteriorated to the point that they needed to be replaced. Erkiletain's subcontractor replaced most of the panels, but then, at the direction of its surety, stopped working. As a result, all work was halted on the Project as of June 1999. At this point, Park Center decided to replace Erkiletain with another general contractor, Clark Construction Company. Clark's employees inspected the site and determined that the gypsum panels on all of the buildings could be used with only minor repairs. On September 15, 1999, with Floyd gathering steam off the Florida coast and spinning its way northward towards Alexandria, Clark and Park Center signed their contract.

The next day, September 16, 1999, Hurricane Floyd passed through Alexandria. While Floyd's trip inland over North Carolina had diminished its force, it nonetheless hammered the Project with heavy rains and winds up to 55 m.p.h. Following the storm, the Project showed extensive damage, including collapsed roof trusses on one building, damage to an electric switchgear, and waterlogged plywood. In addition, almost all of the gypsum sheathing was saturated and falling apart. Following Floyd, the City of Alexandria directed Park Center to remove the damaged sheathing from the Project. PMA's representative, Jim Hardy, visited the site on September 29, 1999, and acknowledged that the gypsum sheathing had to be removed and replaced.

Prior to Floyd the builders had determined that many of the plywood panels used in one part of the construction site had become waterlogged and needed to be replaced. Following Floyd, all of the plywood needed to be replaced. In its claim Park Center estimated that 20 to 25 percent of the plywood was not damaged prior to Floyd, and only that percentage was included in its claim.

Also, prior to Floyd the buildings of the Project had been heated as soon as they were entirely enclosed in gypsum panels. The internal water pipes of those buildings had then been filled with water on the assumption that they would be protected from the freezing temperatures of the upcoming winter. When the builders had to remove and

replace the sheathing after Floyd, the buildings could no longer be heated. To prevent pipe breakage, the builders tried to drain the interior pipes of all water before removing the sheathing and exposing the pipes to the cold. The pipes were not designed to be drained, however, and a number of pipes contained valves that, unbeknownst to the builders, retained water. In the spring, after the panels had been replaced and the pipes had been refilled, the builders discovered that the pipes had frozen at several points and needed repair.

Park Center filed an insurance claim requesting coverage for the damage to the trusses, the electrical switchgear, the plywood, the gypsum sheathing, and the pipes. Park Center also sought coverage for damages from delays on the Project due to Floyd. PMA denied all elements of the claim, asserting that most of the relevant property had already deteriorated and needed replacement prior to Floyd and that the rest of the damage was excluded by the policy.

The district court, applying Virginia law, held that the policy provided coverage for most of Park Center's claims. The parties do not contest the district court's choice of Virginia law. Nor does PMA contest every aspect of the coverage determination. We discuss only those parts of the district court's order that are the subject of appeal.

The parties presented extensive evidence to the district court on the condition of the gypsum panels prior to Floyd. The evidence consisted of numerous pre- and post-Floyd photographs of the Project and the testimony of various persons who had examined the Project at some point prior to Floyd. Based on its evaluation of this evidence, the court determined that while a small portion of the gypsum sheathing was damaged and needed some repair prior to Floyd, the vast majority of the paneling was usable until the additional damage caused by Floyd. The court also found that given the extent of the damage caused by Floyd, it was cheaper to replace the gypsum sheathing in its entirety rather than to conduct spot repairs. Accordingly, the court awarded the entire cost of replacing the two layers of gypsum sheathing to Park Center.

In addition, the district court held that the policy provided coverage for the burst pipes. The court determined that the burst pipes were a direct result of Floyd, even though the damage was also caused by

freezing temperatures, a cause excluded by the policy. Finally, the court held that the policy provided coverage for the claimed damage to the percentage of the plywood that was useable before Floyd.

## II.

On appeal PMA raises a number of challenges to the district court's decision, both as to factual and legal matters. We, of course, review the district court's factual findings for clear error and its legal conclusions *de novo. See Anita's New Mexico Style Mexican Food, Inc. v. Anita's Mexican Foods Corp.*, 201 F.3d 314, 316 (4th Cir. 2000).

## A.

As an initial matter, PMA argues that the district court erred by failing to issue adequate conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure. Rule 52(a) requires that in a bench trial "the court shall find the facts specially and state separately its conclusions of law . . . ." Fed. R. Civ. P. 52(a). The rule also provides that "[i]t will be sufficient if the findings of fact and conclusions of law . . . appear in an opinion or memorandum of decision filed by the court." *Id.* Here, in addition to the district court's order of judgment, the court separately issued findings of fact and a memorandum opinion adequately stating its factual and legal conclusions and the reasons for its decision. PMA challenges the court's failure to include a specific factual or legal finding in support of each and every aspect of the analysis, for example, on who bore the burden of proving coverage under the policy. Such specificity is not required by Rule 52(a). The district court's memorandum opinion and findings of fact are clearly sufficient to inform the parties of the bases of the court's decision and to permit review of the decision on appeal. Accordingly, PMA's argument under Rule 52(a) is without merit.

## B.

More substantively, PMA raises various challenges to the court's determination that most of the gypsum panels did not need replacement prior to Floyd and its corresponding conclusion that the damage

to the panels was a covered loss. First, PMA argues that the court erred in failing to apply an objective standard in determining whether the panels needed replacement prior to Floyd. Second, PMA points to the 30-day national standard for gypsum panel exposure to the elements and numerous photographs of pre-Floyd damage to the panels and asserts that the district court's factual determination that most of the panels did not need replacement prior to Floyd was clearly erroneous. Third, PMA argues that the district court erred by failing to reduce Park Center's recovery by the value of the panels that were already damaged prior to Floyd. We address these contentions in turn.

PMA argues that the district court committed a legal error by relying on the subjective evaluation of the condition of the gypsum panels offered by Park Center's four witnesses instead of the objective measure of the condition of the panels provided by the 30-day national standard for exposure introduced by PMA's expert. We disagree. While the proffered 30-day standard may have had some evidentiary value, the question before the district court was not how long gypsum panels in general may safely be exposed to the elements, but whether these particular gypsum panels, given the specific weather conditions they had been exposed to, had actually deteriorated so as to require replacement. To answer that question, the district court properly considered not only the 30-day standard but the testimony of four individuals who had personally inspected the panels. PMA's own expert testified that while the 30-day standard is a "flag" after which gypsum panels should be "looked at[,] possibly tested," the standard is "not an automatic cutoff of the product" indicating that the builder should "take it down and replace it." Thus, according to PMA's own expert, the testimony of individuals who had actually inspected the gypsum panels was more relevant to determining their condition than the mere fact that the panels had been exposed to the weather for more than the 30-day period. The court's refusal to rely exclusively on the proposed 30-day standard was proper.

We now turn to the court's factual determination. As noted above, both parties presented extensive evidence in their attempts to establish whether and to what extent the gypsum panels had deteriorated and needed replacement prior to Floyd. After careful review of this evidence, we have no doubt that the district court's factual determination was not clearly erroneous. As the court pointed out, the 40 to 50 pho-

tographs revealing isolated damage to certain panels prior to Floyd are fairly insignificant in light of the over 17,000 panels that required replacement post-Floyd. Indeed, the post-Floyd photographs show the nearly complete destruction of almost all visible panels, whereas the damage in the pre-Floyd photographs can be found only after a careful, panel by panel search through the pictures. Additionally, as noted above, the district court placed more weight on the testimony of four witnesses who had personally inspected the gypsum panels than on the 30-day national standard. Far from being clearly erroneous, this treatment of the evidence strikes us as proper. Finally, the court pointed out the significant fact that Clark Construction, the new general contractor for the Project, had examined the gypsum sheathing and planned to use it, with minor repairs, until Floyd hit. Accordingly, the district court's determination that most of the gypsum panels did not require replacement prior to Floyd was not clearly erroneous.

Finally, PMA argues that the district court erred by failing to reduce Park Center's recovery by the value of the five to ten percent of the panels that were admittedly damaged prior to Floyd. Park Center's witnesses testified that while a small percentage of the gypsum paneling was damaged prior to Floyd, that damage would have been remedied with spot repairs to specific areas of panels, not wholesale replacement of the panels. In contrast, the district court found that after Floyd it was more cost effective to simply replace all of the sheathing, even the few panels that might have been salvageable, rather than to conduct a panel-by-panel evaluation and repair. If Floyd had simply added to the number of panels that needed spot repairs, Park Center would not be entitled to coverage for those repairs that were needed prior to Floyd. However, the damage caused by Floyd was so extensive that it rendered such panel-by-panel repairs more costly than wholesale replacement. Therefore, the district court did not err in awarding Park Center the cheaper cost to replace all of the panels.*

---

*PMA also argues that the district court's failure to deduct a percentage of the costs to account for pre-existing damage illustrates that the court improperly shifted the burden to establish coverage (or noncoverage) to PMA, rather than placing that burden on Park Center. We attribute the district court's silence on the specific issue of who bore the initial burden of proof as a mere failure to mention the obvious rather than an unspoken attempt to improperly shift the burden. PMA's contention on this point has no merit.

In sum, there was no error in the district court's determination that the damage necessitating replacement of the gypsum panels was caused by Floyd, not by pre-existing deterioration, and that no deduction for pre-existing damage was necessary.

C.

Assuming that the relevant damage to the gypsum panels was caused by Floyd, PMA argues that the costs to replace those panels are nonetheless excluded by a specific provision of the policy. PMA also argues that the same provision excludes coverage for the frozen pipe damage.

The relevant exclusion section of the policy, § B.3, provides that the insurer "will not pay for a 'loss' or damage caused by or resulting from . . . deterioration, . . . changes in or extremes of temperature, or dampness or dryness of atmosphere." PMA points out that Park Center's own witnesses acknowledged that some of the gypsum panels were already damaged prior to Floyd due to deterioration from exposure to dampness in the atmosphere. PMA argues that under Virginia law a loss caused in part by a covered cause of loss (here, Hurricane Floyd) and in part by an excluded cause of loss (here, deterioration from weather conditions) is excluded in its entirety. In support of this argument, PMA cites *Lower Chesapeake Assocs. v. Valley Forge Ins. Co.*, 532 S.E.2d 325 (Va. 2000).

PMA is correct that *Lower Chesapeake* illuminates this issue, but *Lower Chesapeake* supports, not contradicts, the district court's decision here. The insurance policy in *Lower Chesapeake* was similar, in relevant part, to the policy here. Specifically, the policy contained an exclusion provision, also denoted as § B.3, stating that the insurer "will not pay for a 'loss' caused by or resulting from . . . wear and tear [or] . . . gradual deterioration." *Id.* at 330. In addition to the § B.3 exclusion provision, in § B.1 the policy provided that the insurer "will not pay for a 'loss' caused directly or indirectly[,] . . . regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss,' [by] . . . surface water [or] waves." *Id.* at 329-330.

In *Lower Chesapeake* the property at issue was a set of docks damaged by Hurricane Fran. The docks had been allowed to deteriorate

significantly over the years, and the district court found that the damage to the docks was caused at least in part by this deterioration. *Id.* at 331. Additionally, the damage was caused in part by Fran's wind and pounding waves. *Id.* In addition to the direct damage caused by the waves, the waves also caused the boats moored to the docks to pitch violently, tearing the metal cleats from the wooden docks. *Id.* at 327. The Virginia Supreme Court explained that while multiple causes contributed to the loss, coverage for the damage was totally excluded because one of the causes, the waves, was a § B.1 cause. *Id.* at 331. By the plain terms of the § B.1 exclusion, any loss caused even in part by one of the listed § B.1 causes was completely excluded from coverage.

In the case at hand, as in *Lower Chesapeake*, the policy contains an analogous § B.1 exclusion as well as an analogous § B.3 exclusion. Section B.1 completely excludes coverage for a loss caused in any way, "directly or indirectly," "regardless of any other cause or event that contributes concurrently or in any sequence," by the factors enumerated in § B.1. However, PMA does not contend that the damage to the Project was caused, even in part, by any of the § B.1 factors, as was the case in *Lower Chesapeake*. Rather, the only contributing causes of the damage other than Floyd itself was deterioration and atmospheric dampness. But, as noted above, deterioration and atmospheric dampness are not listed under § B.1, but under § B.3. Section B.3 does not contain the broad exclusionary language of § B.1. Accordingly, damage caused in part by a § B.3 factor and in part by a covered factor is not excluded in its entirety. Rather, only the damage attributable to the § B.3 factor is excluded; the rest of the damage is covered. As explained in part II.B, *supra*, this is precisely how the district court determined the award. Thus, we affirm the district court's determination that the damage to the gypsum panels was not excluded by any of the policy's exclusion provisions.

PMA also claims that the damage to the pipes is excluded by the policy. The damage to the pipes was caused by sub-zero temperatures, which froze the trapped water, breaking the pipes. PMA correctly notes that § B.3.d of the policy excludes losses caused by "[c]hanges in or extremes of temperature" and argues that the damage to the pipes is therefore clearly excluded.

Of course, one cause is not exclusive of other causes, and here, just as the pipe breakage was caused by exposure to freezing temperatures, the exposure of the pipes was caused by the damage done by Hurricane Floyd. The pipes were exposed to the cold only because the building could not be heated during the removal and replacement of the panels, which was necessitated by the damage done by Floyd. The breakage to the pipes was caused both by a covered cause, Floyd, and by an excluded cause, extremes in temperature.

Section B.3 does not explain the outcome when a covered cause of loss (Floyd) results in an excluded cause of loss (exposure to freezing temperature). If "freezing temperature" was a § B.1 excluded cause, the damage here would clearly be excluded, for § B.1 clarifies that the insurer "will not pay for a 'loss' caused directly or indirectly[,] . . . regardless of any other cause or event that contributes concurrently or in any sequence to the 'loss.'" In contrast, § B.3 contains no such clearly applicable language. It only addresses the converse, providing that when "an excluded cause of loss . . . results in a Covered Cause of Loss," the latter will be covered. Under Virginia law, "language setting forth exclusions that limit coverage under a policy . . . [must] clearly and unambiguously define[ ] the scope of the exclusions." *Lower Chesapeake*, 532 S.E.2d at 331. If an exclusionary provision "may be understood in more than one way, we will interpret the policy in a manner that provides coverage." *Id.* at 331-32. In light of these principles, and in the absence of any clear language in § B.3 dictating exclusion in this multiple-cause situation, we affirm the district court's holding that the damage caused by the frozen pipes is covered under the policy. The damage to the panels caused by Floyd, a covered cause of loss, was a cause of the damage to the frozen pipes; absent clear contractual language to the contrary, that damage is not excluded because it was also caused by freezing temperature, an excluded cause of loss.

## D.

PMA next challenges the district court's award of costs for the replacement of plywood damaged by Floyd. Park Center concedes that much, but not all, of the plywood already needed replacement prior to Floyd. Park Center explains that it filed a claim for only a small percentage of the plywood, the amount it estimated was useable

pre-Floyd. PMA presented no evidence that all of the plywood needed replacement prior to Floyd. Rather, PMA argues that the claimed percentage was simply invented out of the blue and that Park Center failed to provide sufficient evidence for the district court to reasonably ascertain how much plywood was usable prior to Floyd.

To recover under Virginia law, a plaintiff must produce some evidence "to enable the [factfinder] to form a reasonable estimate of what portion of the damage" is attributable to the defendant. *Hale v. Fawcett*, 202 S.E.2d 923, 925 (Va. 1974). At the same time, a defendant "should not be allowed to escape all liability simply because the precise amount of the damages for which he is responsible is uncertain. Where the existence of a loss has been established, the quantum may be fixed when the facts and circumstances are such as to permit of an intelligent and probable estimate thereof." *Jefferson Standard Life Ins. Co. v. Hedrick*, 27 S.E.2d 198, 202 (Va. 1943).

Here, the only testimony regarding the percentage of plywood that was usable prior to Floyd came from James W. Reed, a senior project manager for Clark Construction. Reed explained that Clark Construction came up with the estimate after Floyd had hit, in consultation with Jim Hardy, a PMA representative who visited the site following Floyd. In this case, as in *Hedrick*, "[p]ositive and distinct damages have been established" and the "approximate amount was based upon the estimates of those who were qualified to pass upon the nature and extent of the damages." *Id.* at 203. We conclude that Reed's testimony provided a sufficient basis for the court to approve the estimate, and we affirm the district court's award of the costs to replace the claimed percentage of the plywood.

E.

Finally, PMA contends that the district court applied an erroneous method of valuation in setting the amount of Park Center's award for the damage to the gypsum panels. Prior to Floyd, the builders had installed two layers of gypsum paneling. Due to the damage caused by Floyd, both layers had to be removed and replaced. For whatever reason, Park Center chose to replace the two layers of damaged gypsum sheathing with only one layer of gypsum sheathing and one layer of Tyvec, a synthetic wrapping material. Using one layer of gypsum

and one layer of Tyvec was evidently cheaper than the cost of two layers of gypsum sheathing. The district court awarded Park Center the estimated cost of replacing the two damaged layers of gypsum with two new layers of gypsum rather than the cost Park Center had actually incurred replacing the two damaged layers with one layer of gypsum and one layer of Tyvec. On appeal PMA argues that Park Center's recovery should be limited to the amount it actually spent replacing the sheathing, not estimated replacement costs that were not actually incurred. We agree with PMA that Park Center's replacement cost recovery must be limited to the money actually spent by Park Center to replace the damaged property, so we vacate the district court's award as to the gypsum panels and remand for calculation of Park Center's actual replacement costs.

The policy provides for two methods of valuation of covered property, replacement cost basis and actual cash value basis. For new construction, the policy uses replacement cost basis as the default method of valuation but allows the insured to elect actual cash value instead. Policy § E.2.a(2). Actual cash value is defined elsewhere in the policy as the cost to replace the property minus depreciation. Policy § E.2.b(1). Here, Park Center has not elected actual cash value, so it may only recover on a replacement cost basis.

The "replacement cost" provision of the policy limits recovery to the lesser of the limit of the insurance policy or "[t]he cost of materials and labor to repair, replace or rebuild Covered Property with materials of similar kind and quality." Policy § E.2.a(1)(b). This constitutes the only definition in the policy of the meaning of "replacement cost." Two subsections later, the policy provides the further limitation that the insurer "will not pay on a replacement cost basis for any 'loss' or damage . . . [u]ntil the lost or damaged property has *actually been* repaired, replaced or rebuilt; and . . . [u]nless the repairs or replacement are made as soon as reasonably possible." Policy §§ E.2.a(3)(a), (b) (emphasis added).

Park Center points out that the policy does not expressly provide that "replacement cost" is limited to the amount actually spent replacing the covered property, but simply defines replacement cost as "[t]he cost of materials and labor to . . . replace . . . Covered Property with materials of similar kind and quality." Park Center argues that

the policy language is, at worst, ambiguous as to whether replacement cost is limited to the amount actually spent and that this ambiguity must be resolved in favor of the insured.

While it is true that ambiguous provisions in insurance policies are generally interpreted in favor of the insured, we determine whether a specific provision is ambiguous by considering the policy as a whole. *See Virginia Farm Bureau Mut. Ins. Co. v. Gile*, 524 S.E.2d 642, 645 (Va. 2000) (noting that ambiguous terms in insurance contracts are construed in favor of the insured, but determining that the term "foster child" was unambiguous when read in context). Standing alone, § E.1.a(1)(b) does not impose any requirement that the insured is limited to money actually spent rebuilding or replacing the damaged property. However, § E.1.a(3)(a) precludes replacement cost recovery "[u]ntil the lost or damaged property has actually been repaired." Thus Park Center concedes, as it must, that it would not have been entitled to replacement costs had it abandoned the project and not made any repairs whatsoever.

Park Center claims that § E.1.a(3)(a) merely requires *some* repair or replacement as a precondition to payment and neither states nor implies that recovery is then limited to the amount actually spent. Under Park Center's reasoning, the availability of full replacement costs simply turns on the occurrence of some type of replacement or rebuilding, regardless of how much that replacement differs from the previous form of the damaged property. This would suggest, for example, that if Floyd had destroyed the entire apartment building complex, Park Center could have elected full replacement costs as opposed to actual cash value so long as it erected so much as a small shed on the same property. We decline to interpret these provisions in a manner that would lead to such an odd result.

We can imagine that the parties could have intended for the replacement cost provision to provide full replacement costs irrespective of whether Park Center chose to rebuild or repair the damaged property. This would amount to a decision to insure the previously incurred construction costs. But if that was the case, there would be no reason whatsoever to condition recovery of those past costs on Park Center actually replacing the damaged property in some fashion. The only purpose of a provision such as § E.1.a(3)(a) is to prevent

what has occurred here, that is, to prevent an insured from collecting the costs to fully replace its property, spending only part of that money on a cheaper form of replacement, and then pocketing the net.

In sum, we hold that the clear import of § E.1.a(3)(a) of the policy, which conditions payment on completion of actual repair or rebuilding, when read in conjunction with § E.1.a(1)(b), is that under the replacement cost method in this policy the insured is limited to the money actually spent in replacing the damaged property.

Park Center is not entitled to the money it previously incurred in constructing these two gypsum layers, but rather it is entitled to be reimbursed for placing itself in the same position it was in prior to Floyd. To the extent Park Center has not placed itself in that same position, this is solely of its own choosing. Had Park Center elected to replace the two layers of gypsum sheathing, it would have been reimbursed for those costs. Under the policy, Park Center is entitled to only what it actually spent on the one layer of gypsum and the one layer of Tyvec.

### III.

Park Center cross-appeals the district court's refusal to award attorneys' fees. Park Center included a claim for attorneys' fees in its first amended complaint. The district court dismissed this claim, explaining that absent statutory authority to the contrary, each party must bear its own attorneys' fees. Park Center then filed a motion to reconsider, bringing to the court's attention Va. Code § 38.2-209, which provides for attorneys' fees to the insured in an insurance coverage dispute if the court determines that the insurer denied the disputed claim in bad faith. The court granted the motion and amended its prior order "to provide that if, following trial, the plaintiffs bring themselves within the statutory provisions of Va. Code § 38.2-209, the court will then consider any request for attorney fees."

In the order of the court following the bench trial on the merits, the court disposed not only of the merits issues but also denied Park Center's standing request for attorneys' fees. Park Center cross-appeals this ruling, arguing that the court's previous order had established that the issue of attorneys' fees would not be considered again until the

trial was over, and that it was caught off guard by the court's resolution of the issue in its decision on the merits. We understand why Park Center might have expected the court to solicit additional submissions on the attorneys' fee issue after it decided the merits. Nevertheless, we conclude that sufficient information was presented to the district court during trial to justify its decision to deny Park Center's request for attorneys' fees when it did.

The Virginia Supreme Court has stated that a bad faith analysis under Va. Code § 38.2-209

> generally would require consideration of such questions as *whether reasonable minds could differ in the interpretation of policy provisions* defining coverage and exclusions; whether the insurer had made a reasonable investigation of the facts and circumstances underlying the insured's claim; whether the evidence discovered reasonably supports a denial of liability; whether it appears that the insurer's refusal to pay was used merely as a tool in settlement negotiations; and *whether the defense the insurer asserts at trial raises* an issue of first impression or *a reasonably debatable question of law or fact*.

*CUNA Mutual Ins. Soc'y v. Norman*, 375 S.E.2d 724, 727 (Va. 1989) (emphasis added). Here, the evidence and arguments presented on the merits of the case — the legal and factual correctness of PMA's denial of coverage — bear directly on a number of the considerations for determining bad faith claims denial. For example, the district court's determination of the merits of the claims denial necessarily placed it in an informed position to determine "whether reasonable minds could differ in the interpretation of policy provisions" and "whether the defense the insurer asserts at trial raises . . . a reasonably debatable question of law or fact." *Id.* Indeed, the district court determined that while there was "some evidence of inconsistencies in the position of PMA with regard to coverage and some delay in communicating its position to the plaintiffs," on the whole "PMA had a legitimate, arguably supportable, basis for its refusal to pay the claim." Accordingly, the district court concluded that PMA had acted in good faith.

The district court's reconsideration order promised only that it would consider attorneys' fees if, following trial, the plaintiffs had brought themselves within the provisions of Va. Code § 38.2-209. Throughout the course of the trial, both parties presented, and the court considered, extensive evidence indicative of the reasonableness of PMA's denial of the claim. In light of this evidence of objective reasonableness, the district court evidently concluded that additional evidence of alleged acts by PMA showing subjective bad faith would not aid its decision or bring PMA's conduct within the scope of Va. Code § 38.2-209. We conclude that the court's determination to make the decision without further evidence or argument, while certainly not required, was permissible. Accordingly, we affirm the district court's denial of Park Center's request for attorneys' fees.

IV.

In conclusion, we affirm the bulk of the district court's judgment. We vacate the district court's award of replacement costs to Park Center and remand for recalculation in light of our determination that Park Center may recover only the costs it actually incurred replacing the sheathing, not the costs it would have incurred had it replaced the sheathing as it previously existed.

*AFFIRMED IN PART, VACATED*
*IN PART, AND REMANDED*