PRESENT: All the Justices

ERIE INSURANCE EXCHANGE A/S/O
CHIMNEY HILL CONDOMINIUM
ASSOCIATION, INC.
                                                    OPINION BY
v.  Record No. 190389                   JUSTICE TERESA M. CHAFIN
                                                    MAY 28, 2020
NAOMI ALBA, ET AL.


FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
Leslie L. Lilley, Judge


In this appeal, we must determine whether the Circuit Court of the City of Virginia Beach

erred in finding that a condominium association's insurance provider waived subrogation against

the tenant of an individual unit owner where the tenant was not a named or additional insured.

For the following reasons, we reverse the circuit court's decision and remand the case to the

circuit court for further proceedings.

I.  BACKGROUND

"Courts interpret insurance policies, like other contracts, in accordance with the parties'

intentions as determined from the words they have used in their contract.  The interpretation of

policy provisions presents a question of law that we consider de novo."  *Nationwide Mutual Fire*

*Ins. Co. v. Erie Ins. Exchange*, 293 Va. 331, 336 (2017) (quoting *Lower Chesapeake Assoc. v.*

*Valley Forge Ins. Co*., 260 Va. 77, 87-88 (2000)).

In February 2015, a fire caused extensive damage to portions of property managed by

Chimney Hill Condominium Association (the "Association").  The fire originated in a

condominium unit owned by John Sailsman but leased by Naomi Alba under a residential lease

agreement.  Pursuant to the lease between Sailsman and Alba, Alba agreed "[t]o be responsible

for [her] conduct and the conduct of other persons in the Unit or on the Premises with [her]

consent."  Alba further agreed "[n]ot to deliberately or negligently destroy, deface, [or] damage . . . any part of the Unit or Premises, . . . and to repair or replace any such part of the Unit or Premises affected by such deliberate or negligent actions."  An addendum incorporated into the lease advised Alba that insurance was only carried "on the dwelling itself" and required Alba to purchase "renters insurance" to protect her personal property.

In conjunction with the lease, and as required by the Association, Alba was provided the Association's "Rules & Regulations."  This document stated that the Association "carries a Master Policy of insurance which covers damage to the building structures in the event of fire . . . and carries a deductible" that "will be paid by the unit owner from whose unit . . . the claim originates."  Under the Rules & Regulations, Alba was also to be provided with the Association's Declaration of Condominium and its Bylaws (collectively, the "governing documents"), which the Association "require[d Alba] to obey."

These governing documents instructed the Association as to the insurance it was required to maintain.  The Association's Declaration provided that insurance purchased by the Association would be "for the benefit of the Association, the Unit Owners and their respective mortgagees . . . ," but also permitted "[e]ach Unit Owner [to] obtain insurance, at his own expense, affording coverage upon his own property and for his own liability . . . as he deems advisable."  The Declaration further instructed that the master insurance policy "shall provide that the insurer waives its rights of subrogation as to any claims against Unit Owners and the Association, their respective servants, agents and guests."

In addition to the Declaration, the Association's Bylaws state that "[a]ll Unit Owners shall be liable for the expense of any . . . repair or replacement rendered necessary by his act, neglect or carelessness, or by that of . . . lessees, but only to the extent that such expense is not

2

met by the proceeds of insurance carried by the Association." The Bylaws acknowledged, however, that no provision of the Bylaws "shall be construed so as to modify any waiver by insurance companies of rights . . . of subrogation."

The Association purchased its insurance policy for the condominium property from Erie Insurance Exchange ("Erie"). The policy the Association entered into with Erie named "each individual unit owner of the insured condominium" as an additional insured "with respect to liability arising out of the ownership, maintenance or repair of that portion of the premises which is not reserved for that unit owner's exclusive use or occupancy." As to subrogation, the policy stated, "We waive any right of recovery we may have against the additional insured because of payments we have made under this Coverage Part"—referring to the "ultraflex extra liability coverages" that modified the "commercial general liability coverage form." Elsewhere, the policy additionally stated, "We waive our right to recover from any unit-owner of the condominium described in the 'Declarations.'"

As a result of the losses sustained from the fire, and consistent with its coverage obligations, Erie made $822,432.64 in payments to or for benefit of the Association. Erie, standing in the shoes of the Association under Code § 38.2-207, thereafter brought suit against Alba to recover the payments it made. Erie alleged that Alba or her guest negligently caused the fire by failing to properly dispose of cigarette remains. Alba filed a third-party complaint against Sailsman for indemnification in the event Erie prevailed on its claim against her. [1]

---

[1] Erie initially also brought suit against Alba's guest, Eric Beal, who joined Alba in filing the third-party complaint against Sailsman. Though Beal allegedly resided in the unit with Alba, Alba was the only tenant named on the residential lease with Sailsman. Erie ultimately nonsuited its claim as to Beal, and Beal nonsuited his third-party complaint against Sailsman. For this reason, we limit our discussion of the issues to those concerning Alba.

Although the parties moved for summary judgment, the circuit court denied the motions due to the presence of a genuine factual dispute. The court allowed the parties to restyle their motions as requests for declaratory judgment and requested that the parties brief "what provisions of the Erie Insurance policy support the parties' claims," and whether Alba stepped into Sailsman's shoes under the terms of the Declaration. Alba asserted that the insurance policy was "immaterial" and did not "create a cause of action against [Alba] when such right does not exist under the terms of the condominium documents and lease." Erie asserted that Alba was neither an additional insured nor a unit owner, thus the subrogation waivers had "no application."

The circuit court granted Alba's motion for declaratory judgment. In an opinion letter, the court relied on *Monterey Corp. v. Hart*, 216 Va. 843 (1976), for the proposition that a "tenant can be relieved from common law negligence liability for fire damage if it was the intent of the parties that the tenant be relieved from such liability." The court looked to the Declaration, the Bylaws, and the Rules & Regulations to find that "the intent of the condominium instruments and the common sense application of the provisions thereof" was that Alba, as a tenant "bound by all the requirements of an owner under the condominium instruments," obtained the same benefits conferred by the instruments upon the unit owner, "including the subrogation waiver." Thus, the court held that Erie could not pursue subrogation against Alba. The court allowed Erie fourteen days to file an amended pleading, but Erie elected not to do so. Consequently, the court dismissed Erie's claim against Alba and Alba's third-party claim against Sailsman, finding that the issue was mooted by granting declaratory judgment for Alba. Erie appealed to this Court.

## II. ANALYSIS

"Subrogation is, in its simplest terms, the substitution of one party in the place of another with reference to a lawful claim, demand, or right so that the party that is substituted succeeds to

4

the rights of the other." *Yellow Freight Sys., Inc. v. Courtaulds Performance Films, Inc.*, 266 Va. 57, 64 (2003). This Court has recognized that subrogation is not a "matter of strict right," but is "purely equitable in its nature" and is "dependent upon the facts and circumstances of each particular case." *Centreville Car Care, Inc. v. North American Mortg. Co.*, 263 Va. 339, 345 (2002) (quoting *Federal Land Bank of Baltimore v. Joynes*, 179 Va. 394, 402 (1942)). In so holding, "we have expressly acknowledged that 'Virginia has long been committed to a liberal application of the principle of subrogation.'" *Id.* (quoting *Federal Land Bank*, 179 Va. at 402).

Though the right to pursue subrogation in general is not dependent upon contract, *id.*, Code § 38.2-207, by reference, assigns relevance to the insurance policy and the contractual relationship formed between the insurer and the insured.[2] Additionally, through contract, an insurer can waive its right to pursue subrogation. *See generally* 16 Couch on Insurance 3d §§ 224:139 (2005 & Supp. 2019). While the insurer itself may waive its right to subrogation, the insured may not act to defeat the insurer's claim such that the insurer is prevented from pursuing recovery against the party actually at fault for the harm that necessitated payment under the insurance policy. *See Brighthope Ry. Co. v. Rogers*, 76 Va. 443, 446-47 (1881) ("[T]he assured stands in the relation of trustee to the insurer to the extent of the sum paid, and he cannot even release the right of action . . . so as to defeat the claim of the insurer to reimbursement from the wrongdoer for the injury."). It is generally understood, however, that an insurer may not seek indemnification from its insured, even where the injury insured against was caused by the negligence of the insured himself. *See Farmers Ins. Exchange v. Enterprise Leasing Co.,* 281 Va. 612, 619 (2011); *Walker v. Vanderpool*, 225 Va. 266, 271 (1983).

---

[2] Under Code § 38.2-207, "when any insurer pays an insured under a contract of insurance which provides that the insurer becomes subrogated to the rights of the insured against any other party[,] the insurer may enforce the legal liability of the other party."

With this in mind, and because the question before this Court is whether Alba benefitted from a subrogation waiver, we must necessarily look to the source of the waiver itself. The subrogation waiver language would not be contained in the Association's governing documents, but in the insurance policy between Erie and the Association. The Association's governing documents may have instructed the Association on the insurance it was expected to obtain, but the actual terms of the agreed upon coverage—including the rights and obligations of the parties involved—can only be found in the binding agreement between the Association and Erie as contracting parties.

To the extent it is necessary to review the policy provisions, we apply the rule that "when the language in an insurance policy is clear and unambiguous, courts do not employ rules of construction; rather, they give the language its plain and ordinary meaning." *Partnership Umbrella, Inc. v. Federal Ins. Co.*, 260 Va. 123, 160 (2000). Because, in the present case, the language of the policy provisions is clear and unambiguous, it is unnecessary to look outside of the policy to discern the intent of the parties as to who was protected from subrogation in the event of a claim paid by the insurer.

The policy expressly provided that the Association and the individual unit owners were the named and additional insureds covered under the insurance that the Association agreed to purchase and that Erie agreed to provide. After identifying the individual unit owners as additional insureds under certain coverage parts, Erie waived its rights to recover from them. Neither waiver made any mention of tenants or other non-owner occupants. Thus, the clear inference is that Erie did not intend to waive subrogation as to anyone other than the Association and the individual unit owners. Alba, as neither an individual unit owner nor part of the Association, is not an insured party from whom Erie would be prevented from pursuing

6

recovery, *see Walker*, 225 Va. at 271, and is therefore not protected by any waiver Erie may have made as to subrogation.

Alba argues that even if she is not a named or additional insured under the Association's insurance policy, she should be considered an implied insured of the Association and thereby protected from subrogation. We observe that there is no contractual agreement between Alba and the Association, let alone one that would serve as a shared expression of the mutual intent to vary Alba's common law obligations with respect to potential acts of negligence. Absent this shared agreement, we see no reason to imply a departure from the norm when the parties had the ability to reduce their understanding to writing if they so intended.

Reliance on *Monterey* is inapposite for this reason. In *Monterey*, this Court reviewed a lease agreement between a landlord and tenant to determine the parties' intentions as to liability for the tenant's negligence. 216 Va. at 846-47. *Monterey* stands for the principle that a "tenant's common law liability for losses due to his negligent, reckless, or willful acts is preserved absent a provision in the lease to the contrary." *Allstate Ins. Co. v. Fritz*, 452 F.3d 316, 320 (4th Cir. 2006) (applying Virginia law). *Monterey* involved a direct landlord-tenant relationship between the parties with a lease agreement that spoke to liability for the harm at issue. Here, the Association has no such relationship or agreement with Alba that absolves her of responsibility for her negligence.

Even if the Association's governing documents were construed to be binding agreements between the Association and Alba, the Association simply could not unilaterally imply coverage under its insurance policy or protection from subrogation in light of the unambiguous provisions in the insurance contract that show Erie's opposite intent. *See Brighthope*, 76 Va. at 446-47. It is also unlikely that the governing documents could be read as intending to do so.

7

The Declaration clearly limited the intended scope of the master insurance policy to the "Association, the Unit Owners and their respective mortgagees" and, like the insurance policy itself, even allowed for unit owners to purchase their own insurance in addition to the master policy. The Bylaws placed the ultimate responsibility for lessees' negligence on the individual unit owners, contemplating the possibility that damages arising from a lessee's negligence would not be covered by insurance proceeds. The Bylaws expressly recognized, however, that this delegation of responsibility had no effect on the insurer's waiver of subrogation, implying that the Association was cognizant of circumstances where the insurer might pursue a claim against a unit owner's lessee where warranted. Thus, even if construed as binding agreements between the Association and Alba, the governing documents reflect the Association's expectation of maintaining a lessee's accountability.

The residential lease between Sailsman and Alba was the only binding contract to which Alba was a party. Assuming this Court could look past the Association to the residential lease, there is still no language that disclaims Alba's liability for negligently caused fire damage to the unit or to the Association's property. To the contrary, Alba agreed not to negligently damage the unit or the premises and to repair any damage that resulted from her negligence. As to fire damage specifically, the only provisions contained in the lease pertain to whether Alba would be held to the lease in the event of necessary repairs to the unit. There is nothing in the lease that serves to alter Alba's common law responsibility for her potentially negligent actions; in fact, the terms of the lease expressly reinforce that liability.

It is thus abundantly clear from the contracts and documents involved—primarily the insurance policy, but also the residential lease and the Association's governing documents—that the Association did not intend to assume or absolve liability for the negligent acts of a unit

8

owner's tenants that caused the Association to suffer a loss. It is equally clear that the Association did not intend to subvert Erie's ability to thereafter recover from a tenant whose purported negligence necessitated the insurer's payments for that loss.

For these reasons, we reject the contention that Alba was an implied insured of the Association where no contractual relationship or agreement existed between the two parties to allocate risks and responsibilities, and where the surrounding circumstances reflected the contrary intention of not absolving non-unit owners of responsibility for harm caused by their negligent acts.

## III. CONCLUSION

For the reasons stated, we reverse the judgment of the circuit court and remand for further proceedings.

*Reversed and remanded.*